EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* DOMINGO SALTARI CRESPO, acusado y apelante.

Núm. 7186.—*Sometido:* Noviembre 15, 1938.  *Resuelto:* Noviembre 30, 1938.

*Gaspar Encarnación Santana,* abogado del apelante; *R. A. Gómez, Fiscal,* y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

El día 25 de octubre de 1936 celebraba un mitín la Coalición de los Partidos Unión Republicana y Socialista en la ciudad de Mayagüez. Varios miles de personas se congregaron frente a la tribuna. Hacía uso de la palabra el Sr. Santiago Iglesias Pantín, y aprovechando un momento en que el auditorio aplaudía, Domingo Saltari, que se hallaba confundido en la multitud, logró abrirse paso hasta colocarse a tres o cuatro metros del orador y sacando un revólver que ocultaba en un bolsillo del pantalón, lo descargó contra Iglesias, haciéndole cinco disparos. Huyó el agresor, pero fué capturado a corta distancia de la tribuna, en la misma plaza donde se llevaba a efecto el mitín, por detectives y paisanos que lo seguían, ocupándosele en el acto el revólver con que había hecho los disparos. Conducido inmediatamente al cuartel de la policía, a preguntas del detective Juan R. Colón voluntariamente declaró lo siguiente: Que lo venía persiguiendo (refiriéndose a Iglesias) desde unas manifestaciones que hizo en Washington tratando de "descarrilar" al Partido Nacionalista; que se enteró que Iglesias iba a tomar parte en el mitin y se situó cerca de la tribuna y cuando habló y lo aplaudieron le disparó; que quería matar a Iglesias y que lo había matado, aclarando entonces el detective Colón que Iglesias no había muerto. (T. de E., pág. 26.)

Un poco más tarde vino al cuartel el Juez Municipal de Mayagüez y el acusado, luego de instruírsele sobre sus dere-

chos constitucionales, libre y espontáneamente prestó a dicho funcionario la siguiente declaración:

"Corte Municipal de Mayagüez, P. R., Estados Unidos de América, El Presidente de los Estados Unidos, SS: El Pueblo de Puerto Rico v. Domingo Saltari Crespo. Declaración jurada de Domingo Saltari Crespo. En Mayagüez a 25 de octubre de mil novecientos treinta y seis, ante esta Corte comparece Domingo Saltari Crespo, vecino de Mayagüez, Calle San Juan sitio Dulces Labios, y previo juramento conforme a la ley, dice: Le advierto que soy el Juez Municipal de esta ciudad, que Ud. tiene derecho a declarar o no y que si lo hace tiene que hacerlo bajo juramento, como cualquier testigo y que si lo hace su declaración podrá usarse en su contra el día del juicio de este caso y que su declaración tiene que ser voluntariamente y sin ofrecérsele nada, ¿en estas condiciones usted quiere declarar?

"Manifiesta el deponente que desea declarar voluntariamente y dice: 'Que me llamo Domingo Saltari Crespo, vivo en el barrio Dulces Labios, calle San Juan, Mayagüez, P. R., hace cinco años que vivo en ese mismo sitio, y soy tabaquero, trabajo en La Habanera hace poco más o menos ocho meses o un año y antes trabajaba en Pueblo Nuevo en casa de Francisco Rodríguez, conocido por Araña, también tabaquero; el declarante es natural de Rincón y hace cinco años que vive en Mayagüez. Que soy nacionalista hace cinco años, estando registrado en la Subjunta Nacionalista de Mayagüez donde tiene que estar mi nombre como tal; que el declarante hace cinco años que es y está afiliado a los cadetes de la república, organización del Partido Nacionalista; que ostenta el rango de Sargento del batallón 'Rius Rivera.' Que el declarante no tiene padre ni madre y sí una hermana llamada Claudina Saltari y que reside en la calle Echagüe de la Playa de Mayagüez. Que durante el oscurecer del día de hoy el declarante, mientras se celebraba una manifestación de la Coalición de los Partidos Unión Republicana y Socialista, antes de que llegara la multitud que formaba la misma al sitio donde había de celebrarse un mitin de dichos Partidos, me situé cerca de la tribuna con la idea de hacerle algunos disparos de revólver al Gallego, esto es, a Santiago Iglesias Pantín, Comisionado Residente de Puerto Rico en Washington; que inmediatamente que llegó la multitud de los Partidos de la Coalición a la Playa y cerca de la tribuna me situé frente a ésta con el propósito y la idea de esperar que llegara a dicha tribuna el Sr. Iglésias y empezara su oratoria para matarle, seguramente; que hablaron dos oradores y luego después García Méndez, Miguel Angel, el *Speaker* de la Cámara de Representantes, y entonces empezó a hablar después

de haber sido presentado por García Méndez y estaba esperando que terminara una parte de su oratoria y le aplaudieran para matarlo y que así en el momento que cerró un párrafo de su discurso saqué de la cintura el revólver sistema Smith, marca Secret Service Special, calibre 38, mejor dicho, marca S & W, automático, número 40830, pabón niquelado, cachas negras, casi nuevo, y apuntándole hacia el sitio donde estaba en la tribuna le hice cinco disparos y siendo mi intención dar muerte, creí que lo había matado; la gente empezó a correr, muchos me empujaron y me caí al pavimento, se me cayó el revólver, entonces vino el detective Toro y me cogió, conduciéndome al cuartel de la policía donde presté esta declaración. Que el revólver con que traté de matar al Comisionado Residente Sr. Iglesias es de mi propiedad, lo compré en Aguadilla, a una persona que no recuerdo su nombre; que hace tres años tengo en mi poder dicha arma.

"Que por una hoja suelta que circuló en la ciudad de Mayagüez de la Unión Republicana fué que me enteré que el Sr. Santiago Iglesias Pantín estaba en Mayagüez hoy y tomaría parte en el mitin frente a cuya tribuna me situé para matarlo según he declarado ya. Que mi propósito de darle muerte al Sr. Iglesias era exclusivamente mío, idea mía también. Que desde hace tiempo yo tenía y tengo la idea firme de darle muerte al Sr. Iglesias desde que él dijo en los Estados Unidos que había que desbandar el nacionalismo en Puerto Rico.

"Que como a las once del día de hoy yo me fuí al barrio Algarrobo y regresé como a las seis de la tarde donde fuí a ver a unos familiares que tengo.

"Que además de las cinco balas con las que estaba cargado el revólver de que hice uso para matar al Sr. Iglesias tenía seis de repuesto en los bolsillos del gabán, las cuales me eché al bolsillo por mi costumbre de nunca andar con una sola carga de balas, pues siempre andaba con dos cargas; que el declarante es elector del precinto de Mayagüez por haberse inscrito en 1932 y haber votado en las elecciones de dicho año, no teniendo el declarante conocimiento de si ha sido recusado como tal elector y si su nombre ha sido eliminado de las listas electorales como tal.

"Que el declarante ha estado en la Cárcel de Distrito de San Juan dos veces a visitar al Sr. Pedro Albizu Campos con la esposa de él, habiendo conseguido verle una sola vez, que ahora el declarante rectifica y hace constar que está equivocado en esta parte de su declaración, pues a la Cárcel nunca ha ido a verlo, que fué el 16 de abril en San Juan que lo vió y habló con él y después de eso no ha vuelto a verlo. Que la noticia que ha tenido el declarante de que con sus disparos no llegó a matar al Sr. Iglesias es una que la siente,

pero qué se va a hacer. Que el declarante tiene 32 años de edad y vive solo en un cuartito en la calle San Juan, de la Marina Meridional de Mayagüez. Que el declarante conoce al Sr. Iglesias desde el año 1920, que la primera vez que lo conoció fué en Aguadilla y después en otros pueblos de la isla; que el revólver usado por el declarante con los fines ya indicados no fué declarado ni inscrito de acuerdo con la ley.

"Que lo anteriormente expuesto es cuanto desea decir y declarar el acusado y que lo declarado responde al propósito y es la verdad, toda la verdad y nada más que la verdad y que presta esta declaración libre y voluntariamente y sin reservas mentales de ninguna clase.

"Que leída esta declaración íntegramente por el declarante, el declarante rectifica la misma en el sentido de que ahora recuerda que tampoco habló con el Lic. Pedro Albizu Campos en San Juan el 16 de abril y sí recuerda que lo vió en dicha fecha hablar desde la tribuna en San Juan, pero que no habló con él, que cuando se tiró de la tribuna el declarante se paró al lado de él. Que aclara esto porque no quiere que aparezca una cosa que el declarante no cree cierta o que es una mentira y que lo dijo anteriormente porque no recordaba los hechos anteriormente. Con esta aclaración el declarante ratifica la anterior declaración en todas sus demás partes.—(Fdo.) Domingo Saltari.' Jurada y suscrita ante mí, hoy 25 de octubre de 1936.— (Fdo.) Cristino R. Colón, Juez Municipal.'' (T. de E. 118–122.)

Dos de las balas hicieron blanco en el cuerpo del Sr. Iglesias. Una de ellas le rasgó la piel del hombro derecho, pero no penetró. La otra se alojó en la axila del mismo costado, deteniéndose muy cerca de la arteria humeral.

Acusado Saltari de atentado a la vida, fué juzgado por un jurado que le declaró culpable del delito imputádole. Presentó entonces moción de nuevo juicio que fué desestimada e inmediatamente después se dictó la sentencia que lo condenó a diez años de presidio con trabajos forzados. Contra esta sentencia y contra la resolución denegatoria del nuevo juicio el acusado interpuso este recurso de apelación.

Al solicitar la revocación de la sentencia, la representación del acusado imputa a la corte sentenciadora la comisión de treinta y dos errores. Los hemos examinado todos, y

prescindiendo de repeticiones pueden reducirse a diez y nueve, a saber:

1. Al permitir que en la acusación que se radicó en este caso se antepusiera la palabra Honorable, abreviada, al nombre del perjudicado Santiago Iglesias Pantín.

2. Al no admitir evidencia del número de detonaciones que en adición a las de los disparos del acusado pudieran haber oído los testigos.

3. Al no permitir que en el examen de repreguntas se interrogase al testigo San Antonio si hubo pánico general en la muchedumbre con motivo de los disparos del acusado.

4. Al admitir la declaración del detective Juan R. Colón sobre la confesión del acusado, teniendo como tenía el fiscal la declaración jurada que prestó aquél ante el Juez Municipal de Mayagüez.

5. Al no permitir que en el contrainterrogatorio de los testigos de cargo se le preguntase sobre lo que decía el orador en los momentos de ser atacado por el acusado.

6. Al admitir en evidencia los plomos de balas y una tabla de la tribuna que mostraba perforaciones de bala.

7. Al admitir el negativo de la radiografía de las heridas tomadas por los médicos que asistieron al Sr. Iglesias y al permitir que al ofrecer esta evidencia el fiscal antepusiese el título de ''Honorable'' al nombre del herido Santiago Iglesias.

8. Al no aceptar la excusa del abogado defensor, Sr. Pinto Gandía, al llegar tarde a la corte después de un receso y exigirle que mediante la declaración de un médico probase que su tardanza se debía, como él alegaba, a motivos de enfermedad y no a deseos de dilatar el procedimiento o interrumpir los trabajos del tribunal.

9. Al intervenir la corte en varias ocasiones interrogando algunos testigos.

10. Al no permitir en el examen directo que el acusado y testigos de descargo declarasen sobre las palabras que decía Santiago Iglesias en el momento de los disparos.

11. Al asumir el juez las funciones de fiscal al calificar de sugestiva, *motu proprio,* cierta pregunta de la defensa, hecha en el examen directo del acusado, y más tarde en el examen del mismo testigo al ordenar la eliminación de una contestación sin que el fiscal hubiese objetado ni solicitado tal eliminación.

12. Al impedir, sin objeción del fiscal, que el testigo Enrique Nieves Román declarase lo que decía Iglesias en la tribuna, y al ordenar el juez, de su propia iniciativa, la eliminación de lo que en ese sentido llegó a declarar el aludido testigo.

13. Al ordenar el juez la eliminación de las palabras del mismo testigo imputadas al Sr. Iglesias, a saber: ''El día que Puerto Rico se volviera una república sería un país de bandidos,'' eliminación que se decretó a moción del fiscal sin que éste expusiese los fundamentos de dicha moción.

14. Al no permitir una excepción general al terminar la declaración del mismo testigo, diciendo la corte: ''La corte no admite excepción general, porque se ha tomado excepción cada vez que se ha resuelto algo,'' demostrando así, según la defensa, ''prejuicio, pasión y parcialidad.''

15. Al calificar como una mera apreciación y ordenar la eliminación de la contestación del testigo Felipe Peña (T. de E., págs. 143-145), que dice: ''Fué que las palabras que profirió fueron directas e hirientes a Saltari.'' demostrando así, según la defensa, ''gran prejuicio, pasión y parcialidad manifiestas, asumiendo la posición fiscal.''

16. Al permitir al fiscal en su examen de rectificación que llamase ''asesino'' al acusado.

17. Al denegar instrucciones especiales sobre ''acometimiento y agresión graves'' y ''ataque para cometer homicidio'', y al no permitir que se fundamentase la excepción a la negativa de transmitir tales instrucciones.

18. Al denegar la moción de nuevo juicio y condenar al acusado a diez años de presidio.

19. Al actuar el juez que entendió en la causa careciendo de facultades para actuar como tal, por ser nulo el nombramiento que a ese efecto le fué expedido por el Gobernador de Puerto Rico.

Consideremos primeramente los errores marcados 1, 2, 3, 4, 6, 7 y 8.

■ (1) El anteponer al nombre del perjudicado Santiago Iglesias Pantín el título de ''Honorable'' en la acusación formulada por el fiscal en nada pudo perjudicar los intereses del acusado, mucho menos en un país como éste donde tan liberalmente se usa ese título. Además, el perjudicado es jefe de uno de los principales partidos políticos del país y hace varios años ocupa el cargo de Comisionado Residente de Puerto Rico en Washington, siendo por estos motivos tan conocido en esta Isla que difícilmente se encontrará una persona que sepa leer y escribir que no conozca personalmente o por la prensa al Sr. Santiago Iglesias. De suerte que al aplicársele el título de ''Honorable'' en manera alguna pudo restar o agregar algo a su personalidad, aunque no recomendamos la práctica de usar títulos honoríficos o de clase alguna en documentos judiciales.

■ (2) Completamente impertinente e inmaterial al caso en controversia es el hecho de precisar el número de o aún referirse a cualesquiera otras detonaciones que en adición a las producidas por el revólver del acusado pudieran haber oído los testigos, especialmente cuando como en este caso el acusado no negó que fué él quien produjo las heridas que recibió el Sr. Iglesias.

■ (3) No tratándose en este caso de una denuncia por alteración de la paz pública, ¿qué pertinencia podría tener que los disparos del acusado produjesen o no pánico general en la muchedumbre?

■ (4) El acusado hizo confesiones en dos momentos distintos: Primero, oralmente al detective Juan R. Colón en el cuartel de la policía antes de llegar el juez municipal. Más tarde, al declarar también en el cuartel por escrito ante dicho

funcionario judicial. Siendo así, la declaración escrita ante el juez municipal no excluye la confesión oral anteriormente hecha ante el detective, pues éste, al declarar, no está relatando lo que el acusado dijo por escrito, sino lo que anteriormente le había dicho en el cuartel.

■ (6) En verdad no vemos la materialidad de presentar la tabla de la tribuna con las perforaciones producidas por la bala. Se dijo por el fiscal que su objeto era demostrar la posición desde donde se hizo el disparo, pero en este caso el propio acusado admite que él produjo las heridas, aunque alega que fué en defensa propia. Por la tanto, es inmaterial la dirección de donde partió la bala, y aunque la admisión. de tal evidencia constituye error, la misma no pudo causar perjuicio alguno al acusado.

■■ (7) El negativo de la radiografía era claramente admisible y fué suficientemente identificado por el Dr. Nelson Perea, quien la tomó, pudiendo también ser entregado al jurado al retirarse a deliberar, de acuerdo con el artículo 274 del Código de Enjuiciamiento Criminal, edición de 1935, que dispone:

"Art. 274.—Al retirarse para deliberar, el jurado podrá llevar consigo todos los documentos o escritos (exceptuando las deposiciones) que hayan sido recibidos como pruebas en el proceso, o copias de los archivos públicos o de los documentos privados que también se hayan presentado como prueba y de cuyos originales, a juicio del tribunal, no deben desprenderse las personas en cuyo poder se hallen. También podrán llevar las instrucciones escritas, si las hubiere."

■ (8) El hecho de que la corte exigiese al abogado que probase mediante la declaración de un médico que no compareció a tiempo a la sesión de la corte por hallarse enfermo, ninguna relación tiene con la inocencia o cupabilidad del acusado. Era ésta una cuestión exclusivamente entre el abogado y la corte. En otras ocasiones durante el mismo juicio el abogado defensor llegó después de la hora señalada para empezar la sesión, teniendo la corte que declararse en receso hasta su llegada. (T. de E., páginas 2 y 4.)

Estuvo justificado el juez de la corte inferior en exigir que se le demostrase que el propósito del abogado no era interrumpir o dilatar los procedimientos.

No existen los errores marcados 1, 2, 3, 4, 7 y 8, y en cuanto al sexto, ya hemos visto que no es perjudicial.

Consideremos ahora los señalamientos de error marcados 5, 9, 10, 11, 12, 13, 14, 15, 16 y 19.

■ (5) Se queja el apelante de que no se le permitió repreguntar a los testigos de cargo acerca de lo que hablaba el Sr. Iglesias en el momento de los disparos. Veamos lo que aparece del récord.

El testigo Juan J. San Antonio, primero de los del fiscal, fué sometido por la defensa al siguiente contrainterrogatorio:

"P.—¿Dice usted que en esos momentos hablaba el Sr. Iglesias? R.—Sí, señor. P.—¿Recuerda de qué hablaba el Sr. Iglesias en esos momentos? R.—El Sr. Iglesias comentaba la actitud, criticaba la actitud de un grupo de títeres que cuando pasaba la manifestación Coalicionista se había puesto a pitarla y a tirarle chupones. P.—Al decir títeres, ¿se refiere a los estudiantes? . . . R.—Entendí un grupo de gente, de personas que se ponían a pitar y a tirar chupones y a armar un escándalo frente a la Bolsa y por eso los llamó títeres. P.—¿Recuerda algunas manifestaciones que él hiciese? . . . R.—Él censuraba la actitud, decía que había sido un acto incorrecto de parte de ese grupo de personas haber hecho lo que estaban haciendo. P.— ¿Recuerda si dijo que eran unos desordenados? R.—Sí, señor. P.— ¿Recuerda si dijo que eran unos títeres? R.—No señor, no lo dijo. P.—Esas palabras que decía el Sr. Iglesias, ¿eran palabras fuertes? Juez: Ya ha dicho las palabras.—Fiscal; Me opongo a más repregunta sobre el mismo extremo.—Juez: Pregúntele al testigo cuál era la actitud del Sr. Iglesias. El que fueran fuertes sería una conclusión del testigo. De que sean fuertes o no lo apreciarán los Señores del Jurado.—Fiscal: El Fiscal se opone a que se traiga la actitud del Sr. Iglesias.—Juez: La Corte va a permitir que se le pregunte.— P.—¿Cuál era la actitud del Sr. Iglesias esa noche? R.—¿Qué quiere decir? P.—La actitud de él contra esos títeres. R.—Pacífica. P.— ¿Cuánto tiempo hacía que el Sr. Iglesias estaba hablando cuando ocurrieron estos hechos? R.—Como diez o quince minutos." (T. de E., 10, 11 y 12.)

De la transcripción que precede resulta que a la defensa se le permitió repreguntar ampliamente al testigo sobre lo que hablaba el Sr. Iglesias en los momentos de los disparos. Resulta además del contrainterrogatorio de la defensa que el Sr. Iglesias en manera alguna se refería al acusado ni pronunciaba ninguna frase que pudiese producir un arrebato de cólera, pues es de presumirse que de haberse hecho tales manifestaciones la defensa por lo menos lo hubiera interrogado al testigo y no se hubiera limitado a investigar lo que el Sr. Iglesias decía de aquellas personas que trataron de molestar o interrumpir la manifestación anterior al mitin.

El testigo Juan R. Colón, segundo de los del Fiscal en su examen directo declaró sobre lo que sucedió en el mitin cuando hablaba el Sr. Iglesias. La defensa le hizo las siguientes preguntas:

"P.—¿Dice que cuando ocurrieron esos hechos hablaba el Sr. Iglesias? R.—Sí, señor. P.—¿Hacía uso de la palabra el Sr. Iglesias? R.—Sí, señor. P.—¿Recuerda qué manifestaciones hacía él cuando ocurrieron esos hechos? Fiscal:—Me opongo porque son irrelevantes. Defensa:—Para sostener esta pregunta, porque el Fiscal en el directo trajo a colación de que el Sr. Iglesias hablaba allí. Juez—De todos modos la pregunta del Fiscal se ha limitado a que hablaba. La Corte no permite la pregunta. Defensa:—La defensa toma excepción bajo los siguientes fundamentos: Que habiendo manifestado el testigo que en el momento de ocurrir los hechos el Sr. Iglesias hablaba y estando él presente, la defensa quiere investigar qué hablaba el Sr. Iglesias en el momento de ocurrir los hechos, de lo cual cree la defensa que puede dar testimonio el Sr. Colón." (T. de E., 30 y 31.)

No insistió la defensa en hacer preguntas más directas tendentes a conseguir del testigo que declarase las palabras que dijo el Sr. Iglesias, si es que algunas dijo, que pudieran producir un arrebato de cólera en el acusado. Ya vimos las preguntas que libremente y sin impedimento alguno hizo al anterior testigo San Antonio, ninguna de las cuales sugería siquiera que el Sr. Iglesias hubiese hecho manifestación alguna ofensiva al acusado. Además el fiscal en ninguna

parte del examen directo trató de probar lo que decía Santiago Iglesias. Los testigos sólo se limitaron a decir que en el momento en que hablaba fué que ocurrieron los disparos. Del mismo modo pudieron haber sucedido los disparos mientras el Sr. Iglesias tomaba un automóvil, y en ese caso no hubiera sido motivo de repregunta la procedencia del automóvil, el precio, etc.

Un incidente similar al ocurrido mientras declaraba el Sr. Colón sucedió mientras declaraban los testigos del Fiscal Andrés A. Vélez (T. de E., 59), Ricardo Seguinot (Id., 66), Gilberto E. Rodríguez (id., 97) y Juan Bernard González (id., 103).

Veamos ahora lo que el propio acusado, en el examen directo que le hiciera su propio abogado, declaró sobre las palabras vertidas por el Sr. Iglesias en el momento de los disparos:

"P.—Dígale a los caballeros del jurado las palabras que oyó del Sr. Iglesias.—Fiscal: Muy general. Defensa:—Que se refieran al acusado. R.—Que de acuerdo con nuestros sentimientos políticos que descansan sobre los corazones . . . Defensa:—Diga las palabras que oyó . . . R.—No puedo contestarle. P.—Dígame, ¿qué palabras oyó usted del Sr. Iglesias dirigidas contra su persona que usted creyera que eran contra su persona? R.—El dijo que ahí había un paquete de títeres. P.—¿Qué más dijo? R.—Después de eso que los estudiantes de Mayagüez eran un paquete de desordenados, de títeres, que eso era ahora que estaban bajo el dominio . . . que cuando esto fuera un país libre sería una república de vagabundos y de canallas y de bandoleros. P.—¿No dijo criminales? Juez:—Eso es sugestivo. Defensa:—¿Qué más dijo? R.—Que eran unos bandidos." (T. de E. 128 y 129.)

Eso fué todo lo que declaró el acusado a preguntas de su propio abogado con respecto a lo que el Sr. Iglesias dijera contra él en los momentos en que hizo los disparos. Si algún error pudiera haber existido por parte de la corte al no permitir que otros testigos del fiscal fuesen contrainterrogados sobre este extremo, forzoso es concluir que dicho error no pudo ser perjudicial a los intereses del acusado, pues es de

presumir que dichos testigos a lo sumo hubiesen declarado lo mismo que el acusado, que es la parte verdaderamente interesada en hacer aparecer la gravedad de las supuestas provocaciones e injurias del Sr. Iglesias.

(9) El juez tiene derecho a interrogar los testigos con el fin de aclarar cualquier punto oscuro en sus declaraciones, evitando así que el jurado reciba una impresión errónea de la evidencia. *Pueblo* v. *León*, ante, pág. 429. Las preguntas que en este caso hizo el Juez, conforme aparece del récord, eran de tal naturaleza que ningún perjuicio pudieron causar al acusado.

(10) Ya hemos visto las razones legales que tuvo el juez de la corte inferior para impedir que en el examen de repreguntas se interrogase sobre materia que no había sido objeto de examen directo y en esto actuó correctamente.

(11 y 12) Cuando una pregunta ha sido objetada distintas veces y la objeción ha sido sostenida, puede el juez, de su propia iniciativa, impedir que se repita la pregunta, haciendo así respetar su resolución (*ruling*) e impidiendo de ese modo dilatar innecesariamente el juicio.

(13) Se queja la defensa de que el fiscal solicitó la eliminación de cierta contestación de un testigo sin expresar los fundamentos de su moción y que el juez no obstante la falta de argumentación del fiscal, sostuvo su moción. No es indispensable que toda objeción o moción que se haga durante el juicio, ya oponiéndose a la admisión de evidencia, ya solicitando la eliminación de cualquier contestación, sea argumentada por la parte interesada. Si el juez está convencido de que asiste derecho al fiscal o a la defensa en su caso para solicitar la eliminación de una contestación o para objetar a una pregunta, no es necesario que pierda tiempo, exigiendo que la argumente para convencerse de lo que ya él está convencido. El objeto de la argumentación en tales casos es simplemente convencer al juez y si él está convencido huelga la argumentación.

██ (14) Si una parte objeta a las distintas preguntas hechas a un testigo y toma excepción de la resolución de la corte desestimando sus objeciones no procede que al terminar de declarar el testigo la parte que antes había objetado anote una excepción general a dicha declaración. El juez no tiene para qué expresar que no admite dicha excepción general, pero si lo hace no demuestra con ello pasión, prejuicio o parcialidad como sostiene la defensa.

██ (15) La manifestación: *"Fué que las palabras que profirió fueron directas e hirientes a Saltari,"* hecha por un testigo sin decir en qué consistieron las palabras que de ese modo califica el testigo constituye una mera opinión. Otro testigo pudo haber opinado de distinto modo y estimar que las palabras que el primero calificó de hirientes fueron completamente inofensivas. Estuvo correcto el juez inferior en calificar de mera apreciación la opinión del testigo y ordenar su eliminación sin que ello implique, como pretende la defensa "gran prejuicio, pasión y parcialidad manifiestos."

██ (16) No aparece del récord que el fiscal en su examen de rectificación llamase "asesino" al acusado. Si en efecto lo hizo, debió la defensa objetar en aquel momento y hacer consignar en el récord las palabras del fiscal, su objeción, resolución de la corte, y la instrucción que el juez diera, si es que la dió, para que no se tomase en consideración aquella palabra, haciendo consignar también la falta de tal instrucción en caso de que no hubiera sido dada. No apareciendo del récord nada que sostenga este señalamiento de error, estamos obligados a no considerarlo.

██ (19) De la copia certificada del nombramiento extendido a favor del juez que entendió en esta causa, presentada por la defensa, aparece que el juez especial fué nombrado para sustituir al propietario durante la licencia de veinte días concedida a este último. No actuó el juez especial en sustitución del propietario en un caso en que éste se hubiese inhibido. Por consiguiente, su nombramiento fué perfectamente legal; no siendo de aplicación la jurisprudencia

establecida en el caso de *Annoni* v. *Nadal*, 94 F. (2d) 513. Véase *Balbaño* v. *Cintrón* (ante, pág. 844).

Consideraremos ahora los restantes señalamientos de error.

(17) El delito de atentado a la vida o ataque con intención de cometer asesinato, definido en el artículo 218 del Código Penal (edición de 1937), consiste en un ataque (*assault*) en circunstancias tales que de haber muerto la víctima a consecuencia de la agresión dentro del año y un día siguientes al ataque, el delito cometido por el acusado hubiera podido calificarse de asesinato. En otras palabras, es un asesinato frustrado en que la muerte no tiene efecto por circunstancias ajenas al acusado. En el presente caso, las dos confesiones del acusado, primero ante el detective Colón y más tarde ante el juez municipial, anteriormente transcritas, demuestran hasta la saciedad que el acusado con deliberación y malicia premeditada, intentó privar de la vida a Santiago Iglesias, y que llevando a efecto su intención le hizo cinco disparos, en condiciones tales que con toda probabilidad no sólo debió matar a su víctima, si que también a otras personas que a su lado se hallaban en aquellos momentos. De haber muerto el Sr. Iglesias dentro del término de ley a consecuencia de las heridas recibidas, el delito cometido por el acusado hubiera sido indudablemente el de asesinato en primer grado. No habiendo muerto el Sr. Iglesias, el delito se redujo a ataque para cometer asesinato, también denominado atentado a la vida. (Art. 218, Código Penal.)

La defensa solicitó que se trasmitiesen instrucciones especiales sobre los delitos de ataque para cometer homicidio y acometimiento y agresión con circunstancias agravantes, instruciones éstas que fueron denegadas por la corte.

Para que la provocación reduzca el delito de asesinato a homicidio, tiene que ser aquélla de tal grado que haga perder el dominio de sí mismo a un hombre de temperamento corriente y lo obligue a actuar por el impulso del momento

producido por la provocación, sin la debida reflexión y sin formar un propósito determinado. 1 Wharton's Criminal Law (12 a ed.) 648 y 655. Véanse también las monografías en 21 A.L.R. 603, 612; 27 A.L.R. 1097, y 102 A.L.R. 1019.

Ya hemos visto que las supuestas provocaciones no fueron dirigidas al acusado. La censura que hizo el Sr. Iglesias a aquellas personas que faltaron a sus deberes ciudadanos provocando a los manifestantes, no hubiera sido capaz de producir, aún en las personas por él aludidas, el arrebato de cólera que hubiera justificado reducir un asesinato a homicidio voluntario. Por consiguiente, ¿qué base tenía el juez inferior para transmitir las instrucciones sobre ataque para cometer homicidio y acometimiento y agresión con circunstancias agravantes interesadas por la defensa? Para que el juez inferior esté justificado en transmitir instrucciones sobre delitos inferiores necesariamente comprendidos en el que se imputa en la acusación, es necesario que haya alguna evidencia de la cual el jurado pueda razonablemente inferir que el acusado es culpable del delito inferior. Esta facultad que la ley concede al jurado no puede ser caprichosa o arbitrariamente ejercitada. El veredicto que reduzca el grado del delito debe estar fundado en evidencia tendente a demostrar o capaz de producir duda razonable sobre la existencia del delito inferior, y si esa evidencia no existe, ni el juez puede transmitir instrucciones sobre el delito inferior, ni el jurado puede traer un veredicto reduciendo el grado del imputado en la acusación. *Wilson* v. *State,* 129 S. W. 613, y monografías arriba citadas. Véanse también, por vía de ilustración, los casos de *El Pueblo* v. *Rodríguez Dapena,* 35 D.P.R. 431 y *El Pueblo* v. *Fernández,* 49 D.P.R. 586, en que se imputaba un delito de asesinato a los acusados y donde este tribunal estimó que la evidencia justificaba instrucciones de homicidio voluntario.

Se queja la defensa de que el juez no le permitió fundamentar las excepciones que tomó a las instrucciones

de la corte al jurado. Del récord no aparee tal incidente, pero asumiendo que hubiera existido, aún así no sería ello motivo de revocación, porque si bien se ha resuelto en esta jurisdicción, siguiendo la regla general establecida en el continente, que las excepciones a las instrucciones de la corte deben tomarse antes de que el jurado se retire a deliberar (*Pueblo* v. *Maldonado*, 45 D.P.R. 417), no implica esto que la defensa tenga derecho a argumentar en presencia del jurado las excepciones que tomare contra las instrucciones de la corte. Las excepciones a las instrucciones de la corte son cuestiones de idereho que van dirigidas exclusivamente al juez y que no deben llegar a oídos del jurado. Por eso recomendamos como mejor práctica la que se ha venido siguiendo en la Corte de Distrito de los Estados Unidos para Puerto Rico, cual es dictar la defensa al taquígrafo, en voz tan baja que no puedan ser oídas por el jurado, las excepciones a las instrucciones y sus fundamentos legales, o retirar al jurado mientras se consignan y fundamentan las excepciones, trayéndolo después y sometiéndole entonces el caso definitivamente, ya corrigiendo o ampliando las instrucciones dadas, si es que la corte cree que fueron erróneas o incompletas, ya dejándolas subsistentes y sin alteración alguna si las estima suficientes. Como hemos examinado las instrucciones y las encontramos correctas, ningún perjuicio se causó en este caso al acusado con privarlo de exponer los fundamentos de excepción.

■ (18) El delito de atentado a la vida se castiga con pena máxima de quince años de presidio. Por consiguiente una sentencia de diez años de presidio está dentro de las facultades que la ley concede al juez sentenciador y, consideradas las circunstancias de este caso. no tenemos motivos para alterar su discreción en la imposición de esa pena. *El Pueblo* v. *Agosto*, 14 D.P.R. 620.

  *Por las razones expuestas y habiendo llegado a la conclusión de que no se cometió en esta causa error perjudicial*

*alguno a los intereses del acusado, procede confirmar la sentencia apelada y también la resolución denegatoria de la moción de nuevo juicio.*

El Juez Presidente Señor Del Toro no intervino.