EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* LUIS MEDIAVILLA, conocido por LUIS VILLA, acusado y apelante.

Núm. 7116.—*Sometido:* Febrero 2, 1939. *Resuelto:* Marzo 29, 1939.

R. *Martínez Nadal* y *C. H. Juliá,* abogados del apelante; *R. A. Gómez,* *Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

Luis Mediavilla fué acusado de un delito de asesinato en segundo grado cometido en la persona de Juan Cosme. El jurado lo declaró culpable de homicidio voluntario y la Corte de Distrito de Bayamón le impuso la pena de siete años de presidio con trabajos forzados. Apeló para ante este tri-

bunal, fundando su recurso en los seis errores que imputa a la corte sentenciadora, a saber:

"*Primero:* El veredicto en este caso es contrario a la prueba.

"*Segundo:* El veredicto en este caso es contrario a derecho.

"*Tercero:* La corte inferior cometió error al no dar las instrucciones especiales solicitadas.

"*Cuarto:* La corte inferior cometió error al no dar instrucciones sobre defensa propia.

"*Quinto:* La corte inferior cometió error al declarar sin lugar la moción de nuevo juicio.

*Sexto:* La corte inferior cometió error al negarse a incluir en la transcripción de evidencia la moción de nuevo juicio, las instrucciones especiales solicitadas y las excepciones tomadas a dichas instrucciones.''

■ En los dos primeros señalamientos de error se alega que el veredicto es contrario a la prueba y a la ley. La discusión de estos dos errores requiere que hagamos una reseña de la evidencia que tuvo ante sí el jurado.

La prueba de cargo tiende a demostrar que el interfecto, Juan Cosme, el día 6 de enero de 1937, fué a visitar a su cuñada, Beatriz Marrero, quien residía en el barrio Palmarejo del término municipal de Corozal. Llevó unos dulces para los hijos de su cuñada y preguntó a ésta si sabía si aquel día habría algún baile por allí, contestándole Beatriz que no lo sabía. La obsequió entonces con vino que llevaba en una botella y luego almorzó en la casa. Después de haber almorzado llegó Luis Mediavilla, quien desde su matrimonio con Ana Negrón, hija de Beatriz, vivía en la casa de ésta. Beatriz se hallaba en la cocina y oyó que al entrar Mediavilla éste y Cosme se saludaron, siguiendo Mediavilla para la cocina, donde entabló conversación con Beatriz, lamentándose él de que tenía que cortar un tabaco al día siguiente y que el tiempo que reinaba entonces no era propicio para tal operación. Cosme, que oía la conversación desde la sala, intervino diciéndole que debía hacer como acostumbraban en Comerío, deshojar el tabaco en la plantación en vez de cortarlo, a lo que repuso Mediavilla que no era partidario de

ese sistema porque perjudicaba la calidad del tabaco. Al poco rato Mediavilla salió de la cocina y se dirigió a la sala, donde continuaba Cosme. Beatriz, que permaneció en la cocina, al momento oyó una detonación, creyó que sería un petardo y no hizo caso, pero inmediatamente después oyó una o dos más, y al ir para la sala vió los dos hombres agarrados en lucha corporal. Separó a Luis Mediavilla y notó entonces que Cosme se hallaba herido. Llamó al vecindario que le auxiliaran. Llevó el herido a la cocina, pero como tardaban en prestarle auxilio, lo condujo a su cama. En esos momentos llegó Fernando Santiago, el vecino más cercano, que oyó las detonaciones y a requerimiento de Beatriz fué a prestarle auxilio. Cuando entraba a la casa, se cruzó con Mediavilla que salía. Se dirigió a la cama donde yacía Cosme y le preguntó qué le había pasado, contestándole éste: "Que estoy herido. Mediavilla me cayó a tiros por nada." Santiago pidió una hamaca a su casa y con la ayuda de otros vecinos trasladó al herido al Hospital San Alberto, en Bayamón, donde éste falleció al día siguiente a consecuencias de las dos heridas recibidas.

Ninguno de los testigos, tanto de cargo como de descargo, vió que Cosme tuviese arma o herramienta alguna en el sitio de los sucesos. Sólo el acusado, como veremos más tarde, declaró sobre el formón con que, según él, trató de agredirle el interfecto, declaración que indirectamente corroboró el Dr. Piñero, quien practicó la autopsia, el cual declaró que tuvo oportunidad de ver y hablar con Cosme mientras estuvo en el hospital, por ser él médico interno, y quien a repreguntas de la defensa y refiriéndose al interfecto, declaró:

"Estaba consciente, cómo no, y siempre se quejaba de que desgraciadamente no tuvo oportunidad de usar su arma, pero yo le decía que no se agitara; siempre insistía en eso mismo, insistía en que no pudo hacer uso de su arma, que sus hijos se harían cargo de vengar su muerte."

Las palabras que el testigo Fernando Santiago puso en boca del interfecto, que antes hemos transcrito, no fueron oídas por el niño Ernesto Negrón, cuñado de Mediavilla, quien llegó antes que Santiago a la casa de Beatriz.

Declaró esta última, además, que su hija Ana, la esposa de Mediavilla, hacía un mes había requerido dos veces a Cosme para que no volviese a la pequeña tienda de ella, porque Cosme iba allí a hablar con una mujer de mala reputación de quien estaba celosa la esposa de Cosme, que a su vez era hermana de Beatriz y tía de Ana, y quien había criticado a ésta por permitir que Cosme hablase en su casa con la indicada mujer. Que Cosme se molestó por lo que le dijo Ana y le contestó que él sabía que ella actuaba por indicación de Mediavilla, su esposo, y agregó:

"Yo me creía tener un amigo, de hoy en adelante tengo un enemigo; ésto lo arreglaremos él y yo más tarde." (R., pág. 15.)

En el examen de repreguntas declaró Beatriz que como mes y medio antes de los sucesos Cosme vino a quejársele de lo que le había sucedido con Ana, repitiendo lo anteriormente expuesto.

El acusado describe la lucha que sostuvo con el interfecto así:

"Viré para atrás, pero cuando pasé por medio de la sala, lo encontré de frente; cuando entré a la salida, había dado una vuelta a las piernas en donde estaba sentado y cuando fuí a pasar brincó de la mesa y me echó mano y me dice: 'Hoy vamos a arreglar la que tú me debes,' y se fué sobre mí, me empujó bastante fuerte; al caer allá, él quedó con una mano metida en la camisa; al ver eso, también hice movimiento—yo tenía el revólver en el seno—al yo meter la mano que vió el revólver, se me fué encima, encima y encima, y yo sacándole el cuerpo, y disparé un tiro al aire; se me fué encima y llegué al seto, arrinconándome al seto; al cogernos, se partió un pedazo de tabla abajo y me fuí por el agujero; en la lucha me ví perdido y le disparé un tiro; seguimos agarrados en la lucha y ahí le disparé otro tiro. Esa es toda la verdad." (R., pág. 48.)

No hizo referencia a formón alguno que el interfecto tuviese en aquellos momentos, pero a continuación del relato que acabamos de transcribir, su abogado le preguntó: .

"¿ Cómo era ese formón?

"Un formón negro, bastante grande.

"¿ Y el cabo?

"De madera.

"Fiscal: El abogado es el que habla de formón ahora. Él no ha dicho nada de eso.

"¿ Qué llevaba el otro en la mano?

"Un formón.

"Cómo era ese formón?

"Negro, tenía bastantes pulgadas y el cabo de madera." (R., pág. 48.)

En el curso de su declaración manifestó el acusado que el interfecto lo atacó con el formón, que el primer disparo lo hizo hacia arriba con el fin de atemorizarlo, pero el interfecto no retrocedía y fué entonces que se partió la tabla. (R., pág. 50.)

De la prueba resulta también que el acusado no fué enterado de las amenazas e injurias que se alega haber hecho Cosme con relación al acusado en presencia de su esposa, Ana Negrón.

Después que el testigo de descargo Juan Negrón Santana identificó el formón como de la propiedad del interfecto, la defensa lo ofreció en evidencia y fué admitido. (R., pág. 63.)

Tal fué en síntesis la prueba que motivó el veredicto del jurado. En su discreción en la apreciación de la prueba, el jurado no dió crédito a la defensa propia alegada por el acusado. Al así hacerlo, no cometió error alguno, pues la evidencia es contradictoria. Nadie más que el acusado vió en poder del interfecto el formón en cuestión. El Dr. Piñero pone en boca del interfecto las manifestaciones que ya conocemos, de las que se puede inferir que el interfecto debió tener un arma de que no pudo hacer uso en los momentos en que fué atacado por el acusado. En cambio, la declaración de Beatriz Marrero, quien intervino cuando aún estaban aga-

rrados el acusado y el interfecto, en momentos en que éste, herido ya, no tenía por qué ocultar el arma, pues de tenerla probablemente hubiera tratado de defenderse con ella, y las declaraciones de Ernesto Negrón, cuñado del acusado, y Fernando Santiago, quienes fueron los primeros en llegar y no vieron tal herramienta, pusieron al jurado en condiciones de dirimir el conflicto rechazando la versión del acusado, así como la del Dr. Piñero, en lo que a la defensa propia respecta. La prueba del fiscal contiene todos los elementos del delito de homicidio voluntario, y no creyendo el jurado la prueba relativa a la defensa propia alegada por el acusado, es ineludible concluir que el veredicto del jurado no fué contrario a la prueba ni a la ley.

■ Los señalamientos de error 3 y 4 imputan a la corte sentenciadora no haber transmitido ciertas instrucciones especiales sobre defensa propia y no haber dado instrucciones generales sobre la misma materia.

Hemos examinado el récord taquigráfico y las instrucciones de la corte al jurado y nada aparece que indique que tales instrucciones especiales fueron solicitadas. Sólo aparece al 'final de las instrucciones y a manera de nota del taquígrafo, lo siguiente:

"Después de tomarse juramento al márshal y retirarse el jurado a deliberar, el Sr. Juliá dijo: 'Tomo excepción a la negativa de la Corte de instruir sobre las últimas instrucciones.' " (R., pág. 73.)

Las últimas instrucciones de la corte son las que aparecen en la página 73 del récord y se contraen a la duda razonable y a dar al acusado el beneficio de la duda sobre la clasificación del delito, declarándolo culpable del menos grave, o sea el de homicidio voluntario, si no creyéndolo inocente tuvieren duda sobre la clasificación del delito, es decir, si era asesinato en segundo grado u homicidio voluntario. Ninguna otra excepción se tomó a las instrucciones y siendo ello así, no podemos considerar el alegado error. *Pueblo* v. *Rodríguez,*

34 D.P.R. 464, 468; *Pueblo* v. *Ramírez,* 50 D.P.R. 234, 271; *Pueblo* v. *Saltari,* 53 D.P.R. 893, 908.

██ Sostiene el acusado que la corte no transmitió instrucciones sobre defensa propia y que se concretó a darlas sobre defensa de morada.

Las instrucciones de la corte a que se refiere la defensa se hallan en las páginas 67–70 del récord y para la mejor inteligencia de la discusión las vamos a transcribir:

"La teoría del acusado es la de que él, si bien dió muerte a Juan Cosme, *él lo hizo en defensa propia, dentro de su hogar.* Para sostener esa teoría que condensa en el sentido de que al él regresar de la cocina de la casa de Beatriz Marrero, Juan Cosme se abalanzó contra él, le empuñó, sostuvieron una lucha; Cosme trató de sacar y sacó de su cintura un instrumento, tipo formón, y que al intentar agredirlo, él hizo uso de su revólver y le disparó tres tiros. Para sostener esa teoría presentó las declaraciones de Ana Negrón, Juan Negrón, Andrés Marrero, Andrés Figueroa, Félix Negrón, Juan Negrón y la propia declaración del acusado.

"Como he dicho, la teoría de la defensa, según la tendencia de su prueba, *es la defensa propia dentro del propio hogar.* El artículo 209 de nuestro Código Penal dice que puede justificarse un homicidio, entre otros casos, cuando lo cometiere alguna persona al defender su morada, propiedad o *persona* contra alguno que manifiestamente intente o procure, por medio de violencia o sorpresa, cometer cualquier *felony* o que violenta, desordenada o tumultuosamente intente o procure penetrar en la morada de otro con el propósito de agredir a alguna persona que se hallare en ella.

"Y dice el artículo 210 del mismo Código, que la mera sospecha de la comisión de cualquiera de los delitos mencionados en el artículo 209 y a que se ha hecho referencia, para impedir los cuales puede legalmente cometerse el homicidio, no bastará para justificarlo la mera sospecha de que tal delito se va a cometer, sino que las circunstancias que concurran deberán ser suficientes para excitar el temor de una persona razonable y será preciso que el matador obre sólo bajo la influencia de dicho temor.

"Un *felony,* saben los señores del jurado, que es un delito grave; es decir, un delito que se castiga con pena de presidio. Y todo acto ilegal de inferir algún daño violento en la persona de un semejante, con la intención de causarle daño, cualesquiera que sean los medios o el grado de violencia que se emplearen constituye un delito de

agresión. Y toda tentativa para cometer una agresión o cualquier señal de amenaza que demuestre en sí o con palabras una intención inmediata, acompañada de aptitud para cometer la agresión es un acometimiento.

"La ley, de modo terminante, consagra como circunstancia justificativa del homicidio, la de cometerle al defender una morada. Ello no quiere decir que en todo caso pueda quitarse la vida de un semejante que ilegalmente intente o procure penetrar en la morada de otro o que dentro de la morada de otro intente agredir o acometa y agrediere a una persona. Es necesario que manifiestamente intente o procure, por medio de la violencia o sorpresa, cometer un delito grave o agredir en forma violenta, desordenada o tumultuosa a alguna persona que en ella se hallare; no siendo bastante para justificar el homicidio la mera sospecha de la comisión de cualesquiera de estos delitos, sino que las circunstancias que concurran deberán ser de tal naturaleza que exciten el temor de una persona razonable y que el matador obre sólo bajo la influencia de ese temor.

"El temor de que habla la ley, como en los casos de defensa propia, no es el temor de un cobarde, sino el temor de una persona de moderado valor, de espíritu sereno. La ley no puede negar su castigo a quien causa la muerte de un ser humano guiado por insignificantes motivos de temor de un daño personal o de perder la vida. Por eso se exige que la impresión producida en el ánimo del acusado esté acompañada de circunstancias tales que despierten el temor de una persona razonable.

"Es mi deber decir a los señores del jurado que cuando la defensa propia se ejercita dentro del propio hogar, ésta es una circunstancia que la hace menos rígida. El morador puede repeler la fuerza por la fuerza en defensa de su persona, de la propia morada o de la propiedad contra aquél que manifiestamente intente o procure por medio de violencia y por medio de sorpresa, cometer un delito grave o de agredirlo en forma violenta, desordenada o tumultuosamente y en este caso él no está obligado a retirarse o a escapar, sino que puede hacer frente a su adversario hasta asegurarse que el peligro ha cesado y si en esas circunstancias mata, el homicidio es justificable y deberá ser absuelto libremente.

"El jurado debe considerar la conducta del acusado y la conducta del interfecto, los medios y la fuerza empleados y todas las circunstancias concurrentes y si encuentra que ellas son bastantes para excitar el temor de una persona razonable y si estima que el acusado obró solamente bajo la influencia de dicho temor, según así se prescribe por la ley, la defensa habrá quedado establecida, o de lo contrario, deberá desecharse."

Las instrucciones sobre defensa propia no son enteramente correctas. Es regla bien establecida tanto en los casos criminales como en los civiles, que las instrucciones transmitidas al jurado deben corresponder al caso que surja de la evidencia practicada, y constituye error transmitir al jurado cualquier instrucción, por correcta que sea, en abstracto, cuando ésta no esté justificada por la prueba.

En el presente caso nada hay en la prueba tendente a demostrar que la muerte se realizó en defensa de morada. Si bien Mediavilla vivía en la casa donde se cometió el crimen y legalmente era aquélla su morada, no es menos cierto que Cosme se hallaba allí legalmente, con el beneplácito de su cuñada, la dueña de la casa. Aceptando como cierta la evidencia del acusado sobre defensa propia, todo lo que de ella surge es defensa propia en relación con la persona, pero no hay la más insignificante evidencia que justifique instrucciones sobre defensa de morada. Sin embargo, el error, a pesar de haber existido, no fué perjudicial al acusado, porque el jurado no pudo ser inducido a error por la instrucción, toda vez que la manera de conducirse el interfecto al penetrar en la casa no permitía al jurado dudar siquiera de que pudiera tratarse de una defensa de morada.

A este efecto dice Ruling Case Law:

"Aunque constituya error transmitir una instrucción que no sea aplicable al caso que surge de la evidencia, tal error es perjudicial solamente cuando la parte que lo alega haya podido ser perjudicada por la instrucción. Los tribunales, sin embargo, generalmente consideran perjudicial cualquier instrucción no justificada por la prueba, *a menos que claramente aparezca que el jurado no ha podido ser inducido a error por tal instrucción.*" 14 R. C. L. 791.

Véanse además *Pueblo* v. *Mejía,* 33 D.P.R. 895; *State* v. *Leatherwood,* 194 P. 600, 602; *State* v. *Moore,* 233 P. 523, 525.

Aparte de estas consideraciones, tampoco hubiéramos podido tomar en cuenta el alegado error, pues conforme hemos dicho anteriormente, el acusado no tomó excepción alguna a

la instrucción sobre defensa propia transmitida por la corte, y no dió oportunidad alguna para reformarla. *Pueblo* v. *Boria,* 12 D.P.R. 170; *Pueblo* v. *Ramírez de Arellano,* 25 D.P.R. 263; *Pueblo* v. *Matos,* 26 D.P.R. 586; *Pueblo* v. *Concepción,* 30 D.P.R. 479; *Pueblo* v. *Valentín,* 36 D.P.R. 425, 427; *Pueblo* v. *Peña Ramos,* 39 D.P.R. 933, 935; *Pueblo* v. *Maldonado,* 45 D.P.R. 417, 422; *Pueblo* v. *Mercado,* 46 D.P.R. 152, 156; *Pueblo ex rel. Rosario* v. *Ferrer,* 47 D.P.R. 85; *Pueblo* v. *Nieves,* 48 D.P.R. 153.

■ No existe constancia alguna en los autos demostrativa de que se hubiera solicitado y denegado un nuevo juicio en la corte inferior. La única constancia que tenemos ante nos es la aseveración del abogado defensor en el quinto señalamiento de error al alegar como tal la supuesta desestimación de la moción de nuevo juicio. No apareciendo de los autos que tal resolución se dictase, ni habiéndose siquiera apelado de la supuesta resolución denegatoria del nuevo juicio, no podemos considerar dicho señalamiento de error.

■■ El sexto señalamiento de error imputa a la corte sentenciadora haberse negado a incluir en la evidencia la moción de nuevo juicio, las instrucciones especiales que alega fueron solicitadas, y las excepciones tomadas a la negativa de transmitir dichas instrucciones.

En cuanto a la moción de nuevo juicio, es evidente que no habiéndose establecido recurso alguno contra la resolución denegatoria del mismo, no procedía incluir dicha moción en la transcripción de autos, puesto que la referida resolución no fué objeto del recurso, que solamente se interpuso contra la sentencia. Véase el escrito de apelación en las páginas 4-5 de la transcripción de autos.

En cuanto a la negativa de incluir en la transcripción de evidencia instrucciones especiales que se alega fueron solicitadas y denegadas, y las excepciones consiguientes, debió el acusado recurrir de dicha negativa para ante este tribunal y perfeccionar así la transcripción, antes de que el legajo de sentencia fuese elevado a este tribunal. En otras pala-

bras, dentro del recurso de apelación contra la sentencia no pueden considerarse los defectos u omisiones de que puedan adolecer la transcripción de evidencia y la transcripción de autos.

*Por lo expuesto, procede la confirmación de la sentencia apelada.*