EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>vs.<br><br>Juan M. Negrón Ayala<br><br>Recurrido | Certiorari<br><br>2007 TSPR 103<br><br>171 DPR \_\_\_\_ |

Número del Caso: CC-2005-754

Fecha: 1 de junio de 2007

Tribunal de Apelaciones:

  Región Judicial de San Juan, Panel IV

Panel integrado por su Presidente, el Juez Gierbolini y los Jueces Cordero y Rodríguez Muñiz

Oficina del Procurador General:

  Lcda. Mayra J. Serrano Borges
  Procuradora General Auxiliar

  Lcdo. Salvador J. Antonetti Stutts
  Procurador General

  Lcda. Mariana D. Negrón Vargas
  Subprocuradora General

Abogado de la Parte Recurrida:

  Lcdo. Antonio Bauza Torres

Materia: Asesinato en Primer Grado, Art. 4.04, Ley de Armas

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

El Pueblo de Puerto Rico

    Peticionario

        vs.                    CC-2005-754      CERTIORARI

Juan M. Negrón Ayala

    Recurrido

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 1 de junio de 2007

El jurado que intervino, como juzgador de los hechos, en el proceso que se celebrara ante la Sala Superior de San Juan del Tribunal de Primera Instancia contra Juan M. Negrón Ayala por el delito de Asesinato en Primer Grado y violación al Artículo 4.04 de la Ley de Armas de Puerto Rico, rindió veredictos de culpabilidad en ambos cargos. Sentenciado que fuera, Negrón Ayala apeló ante el Tribunal de Apelaciones imputándole al foro primario, de manera principal, haber errado al negarse a transmitir al jurado una instrucción sobre el delito de Homicidio Voluntario. El foro apelativo intermedio acogió dicho planteamiento y, en consecuencia, revocó las convicciones apeladas,

devolviendo el caso al tribunal e instancia para la celebración de un nuevo juicio.

Inconforme, el Procurador General de Puerto Rico acudió ante este Tribunal --vía *certiorari*-- imputándole al referido foro apelativo haber errado:

> "...al concluir que, a la luz de la prueba presentada por el Ministerio Público y admitida en evidencia, era necesario que el juez que presidió los procedimientos impartiera instrucciones sobre el delito de homicidio voluntario, cuya ausencia diera lugar a la revocación del veredicto de culpabilidad y la sentencia dictada con el Sr. Negrón Ayala por el delito de asesinato en primer grado."

Expedimos el recurso. Estando en posición de resolver el mismo, procedemos a así hacerlo. Revocamos; veamos por qué.


I

Conforme la prueba que desfilara ante el tribunal de instancia, los hechos ocurrieron el 15 de noviembre de 2001, aproximadamente a eso de las 11:00am, en las oficinas centrales de la Unión de Tronquistas. Como consecuencia de lo ocurrido, el Sr. Noel Colón González, entonces presidente de la mencionada Unión, falleció de seis (6) disparos de revolver que le hiciera Negrón Ayala --hecho que no está en disputa-- mientras ambos se encontraban, solos, en la oficina privada del señor Colón González.

Una lectura de los testimonios prestados durante el proceso por los testigos que declararon en el mismo demuestra, en síntesis, que a la hora mencionada, el

acusado Negrón Ayala, llevando una mochila en sus manos, entró con el señor Colón González a la oficina de éste, cerrándose la puerta tras ellos. Casi inmediatamente después, los testigos escucharon "voces altas", o una "discusión", proveniente de la mencionada oficina[1] y, luego, se escucharon varias detonaciones de armas de fuego, a intervalos de varios segundos. Dichos testigos --todos empleados de la Unión-- vieron cuando Negrón Ayala salió de la oficina, le pidió a uno de ellos que se encargara de su hijo menor de edad --el cual se encontraba en  su automóvil en el estacionamiento de la oficina-- y le entregó un revolver a otro de sus compañeros empleados con la súplica de que lo "desapareciera".

El patólogo forense que practicó la autopsia de Colón González testificó que el cadáver mostraba seis heridas de bala "con trayectoria de abajo hacia arriba y otras con trayectorias de arriba hacia abajo". El agente de la policía de Puerto Rico que realizó la investigación preliminar del asesinato ocurrido ocupó, en la persona de Negrón Ayala, una carta de cesantía dirigida a éste de parte del señor Colón González.

Por otro lado, debe enfatizarse que el recurrido Negrón Ayala testificó en su propia defensa. Su testimonio, es de notar, resulta significativo y determinante a la correcta solución de la controversia hoy ante nuestra consideración, esto es, si el tribunal de instancia venía,

---

[1] Algunos de los testigos no escucharon dichas "voces altas" o "discusión".

o no, en la obligación de transmitirle a los señores del jurado una instrucción sobre el delito de homicidio voluntario. Un análisis del mismo demuestra que el testimonio del acusado, realmente, se limitó a tratar de establecer una defensa propia. Dicho de otra manera, la declaración prestada por Negrón Ayala en corte abierta no estableció la provocación, o circunstancias, que requiere nuestra jurisprudencia para que el magistrado venga en la obligación de trasmitir una instrucción al jurado sobre el delito de homicidio voluntario.[2]

## II

La Constitución del Estado Libre Asociado de Puerto Rico consagra el derecho a juicio por jurado que tiene toda persona que sea acusada por la comisión de delito grave. Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1; véase, además: Pueblo v. Bonilla Ortiz, 123 D.P.R. 434, 438-39 (1989); Pueblo v. Cruz Correa, 121 D.P.R. 270, 276 (1988).

---

[2] En apretada síntesis, el testimonio prestado por Negrón Ayala fue a los efectos de que: luego que Colón González y él entraron a la oficina, el primero le entregó una carta de cesantía; al él cuestionarle el porqué de la misma, Colón González contestó "esto es lo que hay"; Negrón Ayala le requirió, a renglón seguido, el pago de la mesada, a lo que Colón González replicó que a él lo que "le iban a pegar era un tiro"; que, inmediatamente, después de estas palabras vio a Colón González intentar sacar una pistola de su escritorio y fue, entonces, cuando él se le fue encima, hubo un forcejeo, --su mente se le fue en blanco-- y lo próximo que recuerda fue cuando vio a Colón González tirado en el piso. Como es de notar, no hay testimonio alguno a los efectos de que, como consecuencia de la conversación sostenida, él montara en cólera. Por el contrario, su mente "se le fue en blanco", razón por la cual no hubo probabilidad alguna de un arranque de cólera de su parte.

Igualmente, la Regla 111, de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 111 reconoce el derecho a ser juzgado por sus pares a todo acusado de delito grave e inclusive, en ciertas circunstancias, al acusado de delito menos grave. Véase, Pueblo v. Lorio Ormsby, 137 D.P.R. 722, 727 (1994); Pueblo v. Cruz Correa, ante; E.L. Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, 1992, Vol. II, pág. 273.

Dentro de este esquema le corresponde al jurado, como encomienda principal, ser el juzgador de los hechos. Véase: Pueblo v. López Guzmán, 131 D.P.R. 867, 887 (1992) citando a Pueblo v. Cruz Correa, ante, a las págs. 276-78; Pueblo v. Bonilla, ante, a la pág. 439. Ello implica que el jurado tendrá la última palabra no sólo en cuanto a la culpabilidad o inocencia del imputado, sino que, además, será el que determine --en caso de entender que el acusado incurrió en responsabilidad en relación con los hechos que se le imputan-- el delito específico, o el grado del mismo, por el cual éste debe responderle a la sociedad. Pueblo v. Cruz Correa, ante, a la pág. 277; Pueblo v. Bonilla Ortiz, ante, a la pág. 439. En resumen, su función comprende evaluar la evidencia que sea presentada y admitida por el tribunal durante el juicio y llegar a las conclusiones de hechos correspondientes. Luego, aplicando el derecho, según le es instruido por el juez que preside el proceso, deberá emitir un veredicto. Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, ante, a las págs. 319-320.

Es también el jurado el llamado a aquilatar la prueba desfilada y a quien le corresponde decidir si le da crédito o no a la misma. Pueblo v. Lorio Ormsby, ante, a las págs. 727-29.

Ahora bien, en vista de que el jurado está compuesto de personas desconocedoras del ordenamiento jurídico, para que éstos puedan desempeñar su función a cabalidad se requiere que sea correctamente instruido sobre el derecho aplicable por el juez que presida el proceso. Véase: Pueblo v. Lorio Ormsby, ante, a la pág. 727; Pueblo v. Bonilla Ortiz, ante, a la pág. 439; Pueblo v. Cruz Correa, ante, a la pág. 277; Pueblo v. Ortiz Martínez, 116 D.P.R. 139, 150 (1986). De este modo, las instrucciones al jurado son el mecanismo procesal a través del cual el jurado tomará conocimiento del derecho aplicable al caso. Pueblo v. Landmark, 100 D.P.R. 73, 79 (1971).

En varias ocasiones hemos enfatizado la importancia de las instrucciones que el juez debe transmitir al jurado. Pueblo v. Tufiño Cruz, 96 D.P.R. 225, 229 (1968); Pueblo v. Burgos Dávila, 76 D.P.R. 199, 202 (1954); Pueblo v. Méndez, 74 D.P.R. 913 (1953). En términos generales, el acusado tiene derecho a que se le transmita al jurado todos los aspectos de derecho que, bajo cualquier teoría razonable, pudieran ser pertinentes en las deliberaciones, ello aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad. Pueblo v. Acevedo Estrada, 150 D.P.R. 84 (2000); Pueblo v. Miranda Santiago, 130 D.P.R. 507, 518

(1992); Pueblo v. Tufiño Cruz, ante. Esto es así ya que "corresponde al jurado y no al tribunal rendir un veredicto conforme a la ley y los hechos del caso, según aquél aquilate la prueba y determine los hechos." Pueblo v. González Colón, 110 D.P.R. 812, 815 (1981).

Las instrucciones deben incluir los elementos del delito imputado, haciendo hincapié en que el ministerio fiscal tiene la carga probatoria de establecer todos los elementos del mismo más allá de duda razonable. También debe incluirse instrucciones sobre la forma de culpabilidad exigida para ese delito, es decir, sobre la intención o negligencia criminal requerida. Véase, Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, ante, a las págs. 331-32. Ello en vista de que el estado mental o "mens rea" es un elemento subjetivo que le corresponde determinar al jurado a la luz de los hechos. Pueblo v. Bonilla Ortiz, ante, a las págs. 441-42.

Además, las instrucciones deben cubrir los elementos de aquellos delitos inferiores al imputado o comprendidos dentro de éste; ello siempre y cuando la prueba así lo justifique. Véase: Pueblo v. Rodríguez Santana, 146 D.P.R. 860, 886 (1998); Pueblo v. Lorio Ormsby, ante, a la pág. 727; Pueblo v. González Colón, ante, a la pág. 815. Esto es, una instrucción sobre delitos inferiores no le será transmitida al jurado de forma automática, sino que, es necesario que exista evidencia de la cual el jurado pueda razonablemente inferir que el acusado es culpable del

delito inferior. Véase: Pueblo v. Saltari Crespo, 53 D.P.R. 893, 910 (1938).

Vemos pues, que el fundamento para impartirle al jurado una instrucción sobre delito inferior es que la misma esté apoyada en prueba que la justifique. El problema es determinar qué implica el que "la prueba justifica las instrucciones". Sobre este particular se ha expresado que:

> [E]sto sólo puede significar que haya evidencia admitida, que de ser creída por el jurado, sería suficiente como cuestión de derecho penal sustantivo, para que el acusado prevalezca. El juez no debe aquí hacer juicio de credibilidad alguno para no impartir la instrucción, pues estaría usurpando funciones del jurado, en violación del derecho constitucional del acusado a juicio por jurado. ...

Ahora bien, la facultad que la ley le concede al jurado no puede ser ejercitada caprichosa o arbitrariamente. Véase: Pueblo v. Saltari Crespo, ante, a la pág. 910. A esos efectos hemos expresado que:

> El veredicto que reduzca el grado de delito debe estar fundado en evidencia tendente a demostrar o capaz de producir duda razonable sobre la existencia del delito inferior; y si esa evidencia no existe, ni el juez puede transmitir instrucciones sobre el delito inferior, ni el jurado puede traer un veredicto reduciendo el grado del imputado en la acusación. *Ibid*.

Es por ello que un juez actúa correctamente al denegar una instrucción sobre un delito menor incluido si estima que la evidencia, aun pudiendo ser creída por el jurado, resulta insuficiente en derecho para establecer la comisión del referido delito. Chiesa Aponte, Derecho

<u>Procesal Penal de Puerto Rico y Estados Unidos</u>, ante, a la pág. 332.

Refiriéndonos, específicamente, a la procedencia de una instrucción sobre el delito de homicidio en un procedimiento seguido contra un acusado por el delito de asesinato hemos expresado, desde <u>Pueblo</u> v. <u>Galarza</u>, 71 D.P.R. 557, 561-62 (1950), que:

> No es necesario que la prueba de homicidio resulte incontrovertida o concluyente sobre la cuestión; mientras haya algun[a] … prueba a es[os] efecto[s], el jurado es el llamado a aquilatar la misma. De haber alguna evidencia tendiente a demostrar un estado de hechos que haga caer el caso dentro de la definición de homicidio ... es al jurado que incumbe determinar si tal prueba es cierta o no, y si la misma demuestra que el delito cometido fue homicidio ... y no asesinato.

<u>No obstante lo anterior, hemos sido enfáticos en que el tribunal sentenciador no debe transmitir instrucciones de homicidio si los autos carecen de evidencia que justifique tal veredicto</u>. Véase: <u>Pueblo</u> v. <u>Moreno Morales I</u>, 132 D.P.R. 261, 283 (1992); <u>Pueblo</u> v. <u>Torres Rodríguez</u>, 119 D.P.R. 730, 744 (1987); <u>Pueblo</u> v. <u>Padros García</u>, 99 D.P.R. 384, 395 (1970); <u>Pueblo</u> v. <u>Serbiá</u>, 75 D.P.R. 394, 398 (1953). <u>Fomentar dicha práctica equivaldría a autorizar al jurado a que imponga un castigo diferente al prescrito para el delito que de hecho se cometió</u>. *Ibid*.

Como es sabido el Artículo 85 del Código Penal de 1974 dispone que comete el delito de homicidio "[t]oda persona que matare a otra en ocasión de súbita pendencia o arrebato de cólera..." 33 L.P.R.A. sec. 4004. Los elementos de este

delito son: dar muerte a un ser humano, como consecuencia de una pendencia súbita o de un arrebato de cólera, causado por una provocación adecuada de parte de la víctima. Pueblo v. Rivera Alicea, 125 D.P.R. 37, 46 (1989); Pueblo v. Cruz Correa, ante, a la pág. 279. Se trata de un acto intencional e ilegal que causa la muerte, pero por existir circunstancias atenuantes la calificación del delito y la pena varían en beneficio del acusado. La circunstancia atenuante consiste en que el acto del acusado fue una reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con ésta. *Ibid*.

El homicidio se comete sin que medie reflexión y premeditación; esto es, sin un previo plan para matar. Pueblo v. Moreno Morales I, ante, a la pág. 284. Del mismo modo, el elemento de maldad o malicia está ausente en este delito. Pueblo v. Negrón Caldero, 157 D.P.R. 413 (2002). Estas características son las que, precisamente, diferencian al homicidio del asesinato en primer y segundo grado. Véase, Pueblo v. Gómez Nazario, 121 D.P.R. 66, 73 (1988); Pueblo v. Orlando González, 120 D.P.R. 684, 689 (1988).

El homicidio presupone que el autor de la muerte actuó movido por una provocación adecuada de tal naturaleza que lleve a una persona ordinaria a perder su dominio y actuar bajo impulsos mentales causados por cólera, pendencia o emoción violenta. Véase: Pueblo v. Negrón Caldero, ante;

Pueblo v. Moreno Morales I, ante, a las págs. 283-84; Pueblo v. Rivera Alicea, ante, a la pág. 46; Pueblo v. Cruz Correa, ante, a la pág. 279. Sin embargo, la sed de venganza nunca será suficiente para catalogar el delito como un homicidio. La Fave & Scott, Substantive Criminal Law, Minnesota, West Publishing Co., 1986, Vol. 2, sec. 7.10(a), pág. 255; Witkin & Epstein, California Criminal Law, 2da. ed., California, Bancroft-Whitney Co., 1988, Vol. 1, sec. 515, pág. 582. Asimismo, hemos sostenido que "[s]i no existe esa provocación o si habiendo existido [la misma] no es lo suficientemente grave y la actuación del matador está fuera de toda proporción con el grado de la provocación, el acto de dar muerte constituye asesinato aunque el acusado no hubiese preconcebido la idea." Pueblo v. Lebrón, 61 D.P.R. 657, 667 (1943).

De lo anterior se desprende que para determinar la posible comisión del delito de homicidio hay que identificar, al menos, tres factores. Éstos son: (i) que la muerte haya ocurrido mientras el actor se encontraba en un arrebato de cólera o pendencia súbita ("heat of passion"); (ii) que la muerte estuviere precedida de una provocación adecuada; y (iii) que la muerte haya ocurrido antes de que el arrebato o pendencia sufrida por el actor razonablemente se hubiere enfriado ("cooling off period"). Perkins & Boyce, Criminal Law, 3ra. ed., New York, Foundation Press, Inc., 1982, pág. 85; La Fave & Scott, Criminal Law, Minnesota, West Publishing Co., 1982, pág. 573; Torcia,

Wharton's Criminal Law, 15ta. ed., New York, Clark Boardman Callaghan, 1994, sec. 166, págs. 367-69.

Ahora bien, cuando hablamos del delito de asesinato nos referimos a un solo delito consistente, el mismo, en "dar muerte a un ser humano con malicia premeditada." Véase, Artículo 82 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4001. Éste, a su vez, se divide en grados atendiendo a la perversidad demostrada por el acusado al cometer el acto y al sólo efecto de la imposición de la pena. Pueblo v. Rivera Alicea, ante, a la pág. 44; Pueblo v. Pérez Martínez, 84 D.P.R. 181, 184 (1961). El asesinato es un delito que, por su definición y naturaleza, conlleva un acto perverso, malintencionado y contrario a los valores éticos y morales de nuestra sociedad. Denota un estado o condición en el actor, compuesto por una deficiencia inherente en su sentido de moral y rectitud, ello como resultado de haber dejado de preocuparse por el respeto y la seguridad de la vida humana. Rivera Pagán v. Supte. de la Policía, 135 D.P.R. 789, 800 (1994).

En cuanto a los grados de asesinato observamos que la diferencia radica en que el asesinato en primer grado requiere, aparte de la malicia premeditada, el elemento de la deliberación; mientras que en el asesinato en segundo grado la muerte es maliciosa y premeditada, pero la deliberación está ausente. Véase, Artículo 83 del Código Penal, 33 L.P.R.A. sec. 4002; Pueblo v. Gómez Nazario, ante, a la pág. 73; Pueblo v. González Pagán, ante, a la

pág. 689. Esto es, el asesinato en primer grado se caracteriza por la deliberación y la intención específica de matar. Pueblo v. Méndez, 74 D.P.R. 913, 926 (1953). Ello a diferencia del asesinato en segundo grado en el cual basta la malicia premeditada, sin intención específica para matar; es decir, se refiere a la intención de realizar un acto o producir un grave daño corporal que con toda probabilidad resultará en la muerte de una persona. Pueblo v. Méndez, ante; Pueblo v. Blanco, 77 D.P.R. 767, 775 (1954).

La malicia premeditada, que es el elemento mental requerido en el delito genérico de asesinato, implica la ausencia de justa causa o excusa y conciencia al ocasionar la muerte de un semejante. Pueblo v. Carmona, Rivera, 143 D.P.R. 907, 914 (1997); Pueblo v. Robles González, 132 D.P.R. 554, 563 (1993); Pueblo v. Rivera Alicea, ante, a la pág. 45. Por otro lado, la deliberación es la resolución o decisión de matar, después de darle alguna consideración. Véase: Pueblo v. Rosario, 67 D.P.R. 371, 375 (1967).

Ello no obstante, cualquier período de tiempo, por corto que sea, será suficiente para que pueda tener lugar la deliberación. Incluso, hemos sostenido que ese lapso puede ser tan rápido como el pensamiento. Véase: Pueblo v. Echevarría Rodríguez I, ante, a la pág. 368 n. 59; Pueblo v. Rosario, ante. Esto es, tanto la deliberación como la malicia premeditada no requieren necesariamente de un plan previo ni que se conciban con mucho tiempo de antelación a

los hechos. Pueblo v. Echevarría Rodríguez I, 128 D.P.R. 299, 368 (1991). No tiene que transcurrir determinado período de tiempo entre la intención de matar y la muerte misma ya que ambos elementos pueden concebirse en el momento mismo del ataque. Véase: Pueblo v. González Pagán, ante, a la pág. 689; Pueblo v. López Rodríguez, 101 D.P.R. 897, 899 (1974). A esos efectos hemos expresado que "la premeditación [y la deliberación] puede[n] formarse en un instante antes del acto, y puede[n] existir ... no obstante la rapidez con que el acto se haya realizado." Pueblo v. Méndez, ante, a la pág. 921.

Por otra parte, la deliberación y la malicia son elementos subjetivos que, de ordinario, no pueden probarse con evidencia directa por lo que, en ocasiones, es preciso recurrir a los hechos del caso para determinar si de ellos razonablemente pueden inferirse. Pueblo v. López Rodríguez, ante, a las págs. 898-99; Pueblo v. Rosario, ante, a la pág. 375. Estos elementos pueden deducirse a base de los actos y las circunstancias que rodearon la muerte; la relación entre las partes; la capacidad mental, motivación, manifestaciones y conducta del acusado; así como de los hechos anteriores, concomitantes y posteriores al crimen. Véase, Artículo 14 del Código Penal, 33 L.P.R.A. sec. 3061; Pueblo v. Carmona, Rivera, ante, a las págs. 914-15; Pueblo v. Moreno Morales I, ante, a la pág. 287; Pueblo v. Rivera Alicea, ante, a la pág. 45; Pueblo v. López Rodríguez, ante, a la pág. 899. "'Una intención maliciosa y criminal

se presume por la manera ... [en] que ... se comet[e] un acto ilegal con el propósito de perjudicar a otro.'" Pueblo v. Carmona, Rivera, ante, a la pág. 915 citando a Pueblo v. Santiago, 54 D.P.R. 167, 171 (1939).

Cónsono con lo anterior, este Tribunal ha reconocido varias instancias en las que fácilmente se puede inferir la malicia premeditada y/o la deliberación. A modo de ejemplo, podemos señalar: el acto de atacar a una persona con una arma mortífera ya que, del uso de la misma, puede inferirse la intención de matar o causar daños cuya consecuencia probable es la muerte; atacar con una arma a una persona desarmada; dispararle a la víctima en más de una ocasión, a corta distancia y alcanzándola en la cara; dispararle a la víctima dos tiros con un arma de fuego y luego acercársele para dispararle tres veces más mientras le dice "para acabar contigo"; ultimar a balazos a la víctima luego de que ésta retrocediera y rogara para que no le disparara; cuando sin mediar palabras el acusado le dispara a unos jóvenes y mata a uno de ellos; cuando sin mediar palabras el acusado le dispara tres tiros a un policía que le ordenó detenerse; inferirle numerosas heridas punzantes a la víctima atacándola por la espalda; apuñalar al occiso mientras otro lo agarra.

Como expresáramos antes, son precisamente los elementos de malicia y deliberación los que distinguen un asesinato de un homicidio. Para determinar si, en casos como el presente, la prueba justificaba impartir la

instrucción sobre homicidio debemos, en primer lugar, examinar la misma para ver si en la actuación del acusado, al momento de matar a la joven, hubo elementos de malicia y/o deliberación, característicos del delito de asesinato, y, en segundo término, para determinar si, independientemente del hecho de la existencia de malicia y premeditación, se presentó prueba que justificaba, o hacia mandatoria, la instrucción al jurado sobre el delito de homicidio voluntario. (Énfasis suplido y en el original.)

III

Un análisis, objetivo y sereno, de la evidencia que desfilara en el presente caso ante el juzgador de los hechos a nivel de instancia --el jurado-- nos convence de que el Estado presentó prueba, más allá de duda razonable, de todos y cada uno de los elementos del delito por el cual fue convicto el recurrido Negrón Ayala, esto es, por el delito de asesinato en primer grado y que no desfiló prueba que hiciera necesario que el tribunal de instancia le trasmitiera al jurado una instrucción sobre el delito de homicidio voluntario.

Conforme la prueba desfilada, el recurrido Juan M. Negrón Ayala entró --con una mochila-- a una oficina de la Unión de Tronquistas en compañía del Sr. Noel Colón González, quien era el supervisor del primero y la persona que fue asesinada por Negrón Ayala; que luego de que ambos entraron a la oficina, se escucharon unas "voces altas" o

"discusión"; inmediatamente se escuchó una detonación de arma de fuego y, luego, varias detonaciones más en intervalos de varios segundos; que Negrón Ayala salió de la oficina, le pidió a un empleado de la Unión que se encargara de su hijo menor de edad, y le entregó un arma de fuego --el arma que causó la muerte-- a otro empleado y le pidió a éste que la "desapareciera".

Como podemos notar, de la prueba de cargo presentada, el juzgador de los hechos podía razonablemente inferir que: el acusado recurrido llevaba el arma de fuego en la mochila, lo cual demuestra premeditación; que no hubo discusión mayor, o conflicto, entre Negrón Ayala y Colón González después que éstos entraron a la oficina ya que el primer disparó se escuchó casi inmediatamente después de que éstos entraran a la oficina, lo cual elimina la posibilidad de una provocación o arrebato de cólera que justificara una instrucción al jurado por homicidio voluntario; que el motivo de la agresión fue el haber sido despedido de su trabajo; que el acusado Negrón Ayala ciertamente tenía la intención específica de matar a Colón González pues le disparó seis veces; y que el acusado actuó fríamente al cometer el delito pues, luego de los disparos, salió y dio instrucciones sobre el cuido de su hijo y solicitó que desaparecieran el arma de fuego, lo cual demuestra que estuvo en control de sus emociones todo el tiempo. Todo ello nos lleva a la conclusión de que lo ocurrido fue un asesinato en primer grado.

Por otro lado, el testimonio del propio acusado confirma que no se podía considerar, en lo absoluto, que el crimen cometido constituyera un homicidio voluntario, lo cual hubiera requerido una instrucción a esos efectos. Esto es, el testimonio del acusado no establece la provocación ni el arrebato de cólera que requiere nuestra jurisprudencia a esos efectos. Dicho de otra manera, en el presente caso no hubo una provocación "de tal naturaleza que lleve a una persona ordinaria a perder su dominio y actuar bajo impulsos mentales causados por cólera, pendencia o emoción violenta". Pueblo v. Negrón Caldero, ante; Pueblo v. Moreno Morales, ante.

En resumen, somos del criterio que los hechos hoy ante nuestra consideración no son indicativos de una persona actuando bajo los efectos de una súbita pendencia o arrebato de cólera. Por el contrario, entendemos que los mismos claramente demuestran que estamos ante una muerte causada por una persona que actuó, fría y calculadamente, y con sed de venganza, sentimiento que nunca podrá justificar una instrucción por el delito de homicidio voluntario.

En vista de lo antes expuesto, la única instrucción que realmente estaba justificada por la prueba fue la que, precisamente, se le transmitió al jurado: la del delito de asesinato y sus distintos grados. Por tanto, actuó correctamente el juez de instancia al negarse a impartirle al jurado una instrucción sobre el delito de homicidio voluntario.

IV

Procede, en consecuencia, revocar la sentencia emitida por el Tribunal de Apelaciones en el presente caso.

Se dictará Sentencia de conformidad.


                        FRANCISCO REBOLLO LÓPEZ
                             Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

      vs.             CC-2005-754     CERTIORARI

Juan M. Negrón Ayala

    Recurrido

SENTENCIA

San Juan, Puerto Rico, a 1 de junio de 2007

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia revocatoria de emitida en el presente caso por el Tribunal de Apelaciones.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez emitió Opinión disidente a la cual se unió la Juez Asociada señora Fiol Matta.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

       Peticionario

                            CC-2005-754

       v.

Juan M. Negrón Ayala.

       Recurrido

Opinión Disidente emitida por el Juez Asociado señor Rivera Pérez a la que se une la Jueza Asociada señora Fiol Matta.

San Juan, Puerto Rico, a 1 de junio de 2007.

      La Mayoría concluye que el Tribunal de Primera Instancia actuó correctamente al negarse a impartirle al Jurado una instrucción sobre el delito de homicidio voluntario. Somos del criterio que fue ofrecida y admitida prueba suficiente para justificar impartir la instrucción. Le correspondía entonces al Jurado evaluar esa prueba y llegar a las conclusiones de hechos correspondientes. Por tal motivo respetuosamente DISIENTO del curso de acción aquí tomado por la Mayoría.

      Mediante el recurso presentado ante nos se solicita la revisión de una Resolución emitida por el Tribunal de Apelaciones, Región Judicial de San

Juan, mediante la cual se revocó la Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, en la que se declaró culpable al señor Juan M. Negrón Ayala, en adelante señor Negrón Ayala, por los delitos de asesinato en primer grado e infracción a la Ley de Armas. El Tribunal de Apelaciones revocó las convicciones y devolvió el caso para la celebración de un nuevo juicio por razón de que el Tribunal de Primera Instancia había errado al no transmitir al Jurado las instrucciones solicitadas sobre el delito de homicidio. Veamos el cuadro fáctico que origina el presente recurso.

I

El 15 de noviembre de 2001, el señor Negrón Ayala entró a la oficina del señor Noel Colón González, en adelante señor Colón González, entonces presidente de la Unión de Tronquistas, en adelante la Unión, y lo mató de varios disparos de arma de fuego. Sobre este hecho no existe controversia, ya que el señor Negrón Ayala lo admite.

El 26 de diciembre de 2001, el Ministerio Público presentó acusación contra éste por el delito de asesinato en primer grado y por infracción al Artículo 4.04 de la Ley de Armas por conducir y portar una pistola cargada sin haber obtenido una licencia y con la cual causó la muerte al señor Colón González.[3]

---

[3] Apéndice del recurso de *Certiorari,* págs. 106-107; Ley Núm. 404 de 11 de septiembre de 2000, según enmendada.

Luego de varios trámites procesales, el 30 de abril de 2002 comenzó el juicio por Jurado. Al finalizar la presentación de la prueba, y antes que se presentaran los informes al Jurado, la defensa del señor Negrón Ayala solicitó verbalmente que se impartieran instrucciones sobre el delito de homicidio.[4] El Tribunal de Primera Instancia denegó la solicitud ya que no veía justificación para dicha instrucción y procedió a impartir instrucciones de asesinato en primer grado, segundo grado y legítima defensa.[5] El Jurado emitió veredictos de culpabilidad por mayoría de diez (10) a (2) en el delito de asesinato en primer grado y por unanimidad en el delito de violación a la Ley de Armas.

Insatisfecho, el señor Negrón Ayala acudió al Tribunal de Apelaciones alegando la comisión de varios errores, entre ellos, la decisión del Juez del Tribunal de Primera Instancia negándose a impartir instrucciones sobre el delito de homicidio.[6] El 31 de mayo de 2005, el Tribunal de Apelaciones determinó que, ante la prueba presentada por las partes, y admitida durante el juicio, el Tribunal de Primera Instancia venía obligado a impartirle al Jurado instrucciones sobre el delito de homicidio.[7] En consecuencia, el foro intermedio apelativo revocó las

---

[4] Íd., pág. 252.

[5] Íd., págs. 252-253.

[6] Íd., págs. 90-112.

[7] Íd., págs. 5-58.

convicciones y devolvió el caso al foro primario para la celebración de un nuevo juicio.[8]

Insatisfecho, el Procurador General acude ante nos mediante recurso de *Certiorari*, alegando la comisión del error siguiente:

**A. ERRÓ EL TRIBUNAL DE APELACIONES AL CONCLUIR QUE, A LA LUZ DE LA PRUEBA PRESENTADA POR EL MINISTERIO PUBLICO Y ADMITIDA EN EVIDENCIA, ERA NECESARIO QUE EL JUEZ QUE PRESIDIÓ LOS PROCEDIMIENTOS IMPARTIERA INSTRUCCIONES SOBRE EL DELITO DE HOMICIDIO VOLUNTARIO, CUYA AUSENCIA DIERA LUGAR A LA REVOCACIÓN DEL VEREDICTO DE CULPABILIDAD Y LA SENTENCIA DICTADA CONTRA EL SR. NEGRÓN AYALA POR EL DELITO DE ASESINATO EN PRIMERA GRADO.**

II

Durante el juicio en su fondo, el Ministerio Público y la defensa presentaron evidencia y los testimonios de dieciocho (18) testigos. A continuación presentamos, en síntesis, lo declarado por algunos de ellos, conforme a la exposición narrativa estipulada de la prueba, a los fines de exponer los hechos que originan el caso de epígrafe.[9]

La señora Yolanda Landrau Ramos, recepcionista de la Unión y del Hoffa Medical Center, declaró que el 15 de noviembre de 2001, a eso de las once de la mañana, vio a los señores Colon González y Negrón Ayala caminar juntos hacia el área de las oficinas que quedaban en la parte de atrás. Atestó que mientras contestaba el teléfono escuchó una detonación, continuó hablando, escuchó entonces una

---

[8] Íd.

[9] Íd., págs. 207-254.

segunda detonación y que al intentar salir de su área de trabajo escuchó una tercera detonación.[10]

La señora Nilsa Salgado Díaz, Secretaria Ejecutiva de la Unión, declaró que presenció cuando los señores Colón González y Negrón Ayala entraron juntos a las oficinas dentro del edificio de la Unión. A los dos minutos, mientras ella se dirigía a su oficina, escuchó dos detonaciones antes de empezar a gritar por temor y avisarle a la señora Landrau Ramos que saliera de las oficinas. Mientras estaba llamando al sistema de emergencias 911, miró y vio al señor Negrón Ayala pedir se llamara a la Policía, a una ambulancia y a un abogado.[11]

El señor Ángel Figueroa Cortés, representante de la Unión de Tronquistas, vio a los señores Colón González y Negrón Ayala caminar por el frente de él y entrar a la oficina del señor Colón González. Observó que el señor Negrón Ayala llevaba una mochila en sus manos. Escuchó una discusión que provenía de adentro de la oficina y como a los cinco (5) o siete (7) segundos escuchó tres (3) detonaciones. Las detonaciones provenían de la oficina del señor Colón González, en intervalos de tres (3) a cuatro (4) segundos cada una. Inmediatamente se dirigió a la oficina del señor Colón González y trató de abrir la puerta sin éxito. En ese momento, el señor Negrón Ayala le indicó que se llevara a su hijo que estaba en un vehículo en el

---

[10] Íd., págs. 208-211.

[11] Íd., págs. 211-212.

estacionamiento de la Unión. Después, sintió unos golpes de patadas en el piso y escuchó al señor Negrón Ayala decir: "¡Cabrón, quién es el próximo!". De nuevo escuchó al señor Negrón Ayala decirle que: "Llévate a mi nene que está en el parking". Al llegar al vehículo del señor Negrón Ayala, notó que el vehículo estaba encendido y que el hijo de éste se encontraba dentro. En ese momento observó al señor Negrón Ayala salir de las oficinas de la Unión y entregarle un arma de fuego al señor Juan Viñas. Después observó al señor Negrón Ayala acercarse al vehículo encendido, hablar con su hijo, echar la mochila en el carro y entrar de nuevo a las oficinas de la Unión.[12]

El señor José Santos Betancourt, declaró que el arma de fuego, pistola Smith & Wesson, 9mm, color marrón y negra, número de serie A-303533, se le extravió en el mes de octubre del año 1980. Posteriormente se probó que esta fue el arma que le causó la muerte al señor Colón González.[13]

El señor Juan Viñas, empleado en el Departamento de Mantenimiento y Mensajería de la Unión, testificó que estando en el salón de conferencias de la Unión, escuchó las voces altas de los señores Negrón Ayala y Colón González. Se percató que la voz más alta era la del señor Negrón Ayala. Más tarde escuchó un tiro, abrió la cortina pero no vio nada. Segundos más tarde escuchó una ráfaga de tiros provenientes de la oficina del señor Colón González.

---

[12] Íd., págs. 212-216.

[13] Íd., pág. 216

Se tiró al piso, vio a la señora Nilsa Salgado salir corriendo, se levantó y salió corriendo detrás de ella hacia la calle.  Un tiempo después, volvió a las oficinas de la Unión y se encontró al señor Negrón Ayala quien le dijo, "Cógela y desaparécela", en alusión al arma de fuego.  El señor Viñas cogió el arma que estaba todavía caliente y la escondió detrás de unos sacos de cemento en el salón de conferencias de la Unión.  Tres días después procedió a entregar el arma al agente José A. Mojica Rivera.[14]

El agente Agustín Rodríguez Pellot, declaró que a eso de la once y cuarenta y cinco de la mañana (11:45 A.M.), se le informó de un tiroteo en las oficinas de la Unión.  Al llegar a las facilidades encontró al señor Negrón Ayala intranquilo y caminando de lado a lado.  Le notó manchas de sangre en los talones del pantalón, sin embargo no estaba herido en la pierna.  El señor Negrón Ayala le indicó que no iba a hablar hasta que llegara su abogado.[15]

El agente Manuel Pietri, declaró que a eso de las once y cincuenta de la mañana (11:50 A.M.), recibió información de que hubo un tiroteo en la oficina de la Unión.  Al llegar a la escena, notó una mancha de sangre en el tobillo al señor Negrón Ayala.  El señor Negrón Ayala indicó que no estaba herido. Procedió a leerle sus derechos y se puso bajo

---

[14] Íd., págs. 216-220.

[15] Íd., págs. 220-221.

arresto.    En el bolsillo del señor Negrón Ayala se le encontró una carta de cesantía.[16]

El doctor Luis Ariel Ortiz, médico generalista del Hoffa Medical Center, declaró que estaba en la Oficina Administrativa de la Unión cuando escuchó al señor Luis Viñas decir: "Llamen a la ambulancia que Juan mató a Noel". En ese momento se dirigió a la oficina del señor Colón González, donde encontró su cuerpo herido y observó varias manchas de sangre en la pared. Describió que el señor Colón González estaba acostado y parecía que había chocado contra la pared y se había deslizado.[17]

El doctor Francisco Cortés González, patólogo forense, adscrito al Instituto de Ciencias Forenses, declaró que la autopsia del señor Colón González se llevó a cabo el 16 de noviembre de 2001 y se preparó el informe médico forense el 11 de enero de 2002. Identificó seis (6) heridas de bala en el cuerpo, con trayectorias de abajo hacia arriba y otras con trayectoria de arriba hacia abajo.[18]

El señor Negrón Ayala, declaró que el día 15 de noviembre de 2001, tuvo una reunión a l as seis de la mañana en Mayagüez. Su hijo lo acompañó ese día, ya que su esposa estaba en unos seminarios en Estados Unidos. Más tarde en la mañana recibió una llamada del señor Colón González en la cual lo citó a una reunión en las oficinas de la Unión. Al llegar a la Unión, ambos entraron a la oficina del  señor

---

[16] Íd., págs. 221-222.

[17] Íd., págs. 223-225.

[18] Íd., págs. 236-237.

Colón González y el señor Negrón Ayala se sentó en una silla. El señor Colón González abrió una gaveta del escritorio y le entregó al señor Negrón Ayala la carta de despido. Éste la leyó y le cuestionó porque estaban tomando esta acción. A esto, el señor Colón González le indicó, "¿Esto es lo que hay?", a lo que el señor Negrón Ayala le dijo, "Bueno, ustedes me van a tener que pagar la mesada que le pagaron a Gabby". El señor Colón González alegadamente ripostó, "lo que te vamos a pegar a ti es un tiro, cabrón". En ese momento observó al señor Colón González tratar de sacar una pistola del escritorio y fue entonces cuando se le abalanzó encima, forcejearon, momento en que afirmó que la mente se le fue en blanco y que lo próximo que recuerda fue ver al señor Colón González en sus pies. No estaba consciente de cuantos tiros había disparado, no tenía noción de los casquillos en el piso, ni de lo que había pasado.[19]

III

La Constitución de Puerto Rico dispone que toda persona que sea acusada por la comisión de un delito grave tiene derecho a juicio por un Jurado.[20] De igual forma reza la Regla 111, de las de Procedimiento Criminal, la cual

---

[19] Íd., págs. 240-247.

[20] Art. II, Sección 11 de Constitución de Puerto Rico; véase además: Pueblo v. Bonilla Ortiz, 123 D.P.R. 434, 438-439 (1989); Pueblo v. Cruz Correa, 121 D.P.R. 270, 276 (1988).

reconoce el derecho a ser juzgado por sus pares a todo acusado de delito grave.[21]

En nuestra jurisdicción, le corresponde al Jurado el deber de actuar como juzgador de los hechos presentados durante el juicio.[22] Ello implica que será ese Jurado el que tenga la última palabra no sólo en cuanto a la culpabilidad o inocencia del imputado, sino en cuanto a la responsabilidad en relación con los hechos que se le imputan sobre el delito en específico, o el grado del mismo, por el cual éste debe responderle a la sociedad.[23] Su función principal es evaluar la evidencia presentada durante el juicio y llegar a las conclusiones de hechos correspondientes.[24]

Al finalizar la presentación de la evidencia por el Ministerio Público y la defensa, el Jurado será instruido sobre el derecho aplicable al caso por el juez que preside el proceso.[25] Las instrucciones al Jurado deben cubrir, si la prueba lo justifica, no sólo los elementos del delito imputado sino los delitos inferiores al delito imputado o comprendido dentro de éste. También se deben incluir los elementos esenciales de las defensas levantadas por el

---

[21] 34 L.P.R.A. Ap. II, R.111; Véase además: Pueblo v. Lorio Ormsby, 137 D.P.R. 722, 727 (1994).

[22] Pueblo v. Cruz Correa, *supra*.

[23] Íd.

[24] Pueblo v. Rosario Orangel, 2003 TSPR 158, 2003 J.T.S. 167, 160 DPR ____ (2003).

[25] Pueblo v. Cruz Correa, *supra*.

acusado, así como los puntos de derecho que bajo cualquier teoría pueden estar presentes en las deliberaciones, aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad. De igual forma se deben incluir instrucciones sobre la forma de culpabilidad exigida para el delito imputado, es decir, sobre la intención o negligencia criminal requerida.[26] Ello en vista que el "mens rea" es un elemento subjetivo que le corresponde determinar al Jurado a la luz de los hechos.[27]

Las instrucciones sobre delitos inferiores no serán transmitidas de forma automática al Jurado. Será necesario que exista evidencia de la cual el Jurado pueda razonablemente inferir que el acusado es culpable del delito inferior.[28] Sobre este particular se ha expresado lo siguiente:

> "[E]sto solo puede significar que haya evidencia admitida, que de ser creída por el jurado, será suficiente como cuestión de derecho penal sustantivo, para que el acusado prevalezca. El juez no debe aquí hacer ejercicio de credibilidad alguno para no impartir la instrucción, pues estará usurpando funciones del Jurado, en violación del derecho constitucional del acusado a juicio por Jurado…"[29]

En Pueblo v. Galarza, *supra*., citando a Stevenson v. United States, 162 U.S. 313 (1896), nos expresamos sobre la

---

[26]   Pueblo v. Rosario Orangel, *supra*.

[27]   Íd.

[28]   Íd.

[29] E.L. Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, 1992, a la pág. 332.

procedencia de una instrucción por el delito de homicidio en un procedimiento seguido contra un acusado:

> **"No es necesario que la prueba de homicidio resulte incontrovertida o concluyente sobre la cuestión; mientras haya algún indicio de prueba a ese efecto, el Jurado es el llamado a aquilatar la misma.** De haber alguna evidencia tendiente a demostrar un estado de hechos que haga caer el caso dentro de la definición de homicidio…, es al jurado que incumbe determinar si tal prueba es cierta o no, y si la misma demuestra que el delito cometido fue homicidio…y no asesinato.

> ".        .        .        .

> **"Para la corte la prueba puede tender a demostrar de manera abrumadora que se trata en verdad de un asesinato, y no de un homicidio o de un acto de defensa propia. Empero, mientras haya alguna prueba pertinente a la cuestión de homicidio, la credibilidad y peso de la misma es cuestión a ser determinada por el Jurado, y no una de derecho a ser resuelta por el tribunal."[30]**
> (Traducción y Énfasis nuestro)

En Pueblo v. Galarza, *supra*., citando a Kinard v. United States, 96 F.2d 522 (1938), expresamos lo siguiente:

> "Es cierto que la declaración del acusado fue abiertamente controvertida. Podría sostenerse que la prueba tendía a demostrar de manera abrumadora que se había cometido un asesinato más bien que un homicidio voluntario…No era el deber de la corte sentenciadora apreciar la prueba y determinar si el acusado era culpable de asesinato o homicidio, sino meramente determinar la cuestión preliminar de derecho, o sea si hubo tal carencia de prueba sobre homicidio que exigía que la cuestión no fuera sometida a la consideración del Jurado,…
> El hecho de que en el presente caso hubiera otra prueba altamente persuasiva de que se trataba de un asesinato, no afecta la

---

[30] Pueblo v. Galarza, 71 D.P.R. 557, 561-562 (1950). Stevenson v. United States, 162 U.S. 313, 314; 16 S. Ct. 839 (1896).

aplicación     de     la     regla     enunciada."
(Traducción Nuestra)[31]

Por frágil que sea, si de la prueba surge alguna evidencia que justifique un veredicto de homicidio, se deben comunicar las instrucciones de tal delito.[32] **"No importa lo increíble que pueda parecer determinada evidencia al juez que dirige la celebración de un juicio por Jurado.  No es a él sino al Jurado al que corresponde decidir sobre el crédito que deba darse a los testigos."**[33]

Sin embargo, no se deben transmitir tales instrucciones si los autos carecen totalmente de evidencia que justifique tal veredicto.[34]  Permitir que se transmitan tales instrucciones de homicidio cuando los autos están huérfanos de evidencia que justifique tal veredicto, equivale a autorizar al Jurado que imponga un castigo diferente al prescrito para el delito que se cometió.[35]

El Artículo 85 del antiguo Código Penal de Puerto Rico dispone que incurre en el delito de homicidio, "[t]oda persona que matare    a    otra en    ocasión de **súbita pendencia**    o

---

[31] Pueblo v. Galarza, *supra*.; Kinard v. United States, 96 F.2d 522, 68 App.D.C. 250 (1938).

[32]  Pueblo v. Moreno Morales I, 132 D.P.R. 261, 283. (1992); Pueblo v. López Guzmán, 131 D.P.R. 867, 887 (1992).

[33]  Pueblo v. Fernández, 49 D.P.R. 586, 592 (1936).

[34]  Pueblo v. Rosario Orangel., Íd.; Pueblo v. Cruz Correa, 121 D.P.R. 270, 278 (1988); Pueblo v. Torres Rodríguez, 119 D.P.R. 730, 744 (1987); Pueblo v. González Colón, 110 D.P.R. 812, 820 (1981); Pueblo v. Galarza, *supra*.

[35]  Pueblo v. Moreno Morales I, *supra*.

**arrebato de cólera…"**.[36] Los elementos de este delito son: dar muerte a un ser humano, como consecuencia de una pendencia súbita o de un arrebato de cólera, causado por una provocación de parte de la víctima.[37] Se trata de un acto intencional e ilegal que causa la muerte, pero por existir circunstancias atenuantes l a calificación del delito y la pena varían en beneficio del acusado.[38] La circunstancia atenuante consiste en que el acto del acusado consiste de una reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con ésta.[39] Bajo esta modalidad, la muerte de la víctima se produce sin mediar premeditación y sin un previo plan para matar.[40] La provocación que mueve al autor del delito tiene que ser de tal naturaleza que lleve a una persona ordinaria perder su dominio por unos impulsos mentales causados por cólera, pendencia o una emoción violenta.[41] Asimismo hemos sostenido que "[si] no existe esa provocación o si habiendo existido [la misma] no es lo suficientemente grave y la actuación del matador está fuera de toda proporción con el grado de la provocación, el acto de dar muerte

---

[36]  Código Penal de 1974; 33 L.P.R.A: §4004.

[37]   D. Nevares-Muñiz, Codigo Penal de Puerto Rico: Revisado y Comentado, San Juan, Inst. Desarrollo Derecho, 2000, págs. 152-154.

[38]  Pueblo v. Rosario Orangel, *supra*., Véase además, D. Nevares-Muñiz, Codigo Penal de Puerto Rico: Revisado y Comentado, *supra*., pág. 153.
[39]  Íd.

[40]  Pueblo v. Moreno Morales I, *supra*.

[41]  Pueblo v. Rosario Orangel, *supra*.

constituye asesinato aunque el acusado no hubiese preconcebido la idea."[42]  El elemento de maldad o malicia está ausente en este delito.[43]  De igual forma, la sed de venganza nunca será razón suficiente para catalogar el delito de asesinato como un homicidio.[44]

En la modalidad del homicidio por arrebato de cólera se requiere que exista una previa provocación que sea lo suficientemente capaz de lograr una reacción violenta, intencional pero no calculada, ni preconcebida, en el hombre prudente y razonable.[45]  En cambio, en la modalidad del homicidio por súbita pendencia, se requiere la existencia de una pelea súbita, a la cual se entra sin la intención previa de matar o de causar algún tipo de daño corporal.[46] Estas características son las que, precisamente, diferencian al homicidio del asesinato en primer y segundo grado.  De transcurrir un lapso de tiempo durante el cual la persona pueda recobrar su auto control, o ha recapacitado o premeditado, entonces se tratará de un asesinato y no de un homicidio.[47]

---

[42]  Pueblo v. Lebrón, 61 D.P.R. 657, 667 (1943).

[43]  Pueblo v. Rosario Orangel, *supra.*

[44]  Íd.

[45]  D. Nevares-Muñiz, Codigo Penal de Puerto Rico: Revisado y Comentado, *supra.*, pág. 154.

[46]  Íd.

[47]  Íd.

Sobre los factores necesarios para determinar la posible comisión del delito de homicidio hemos expresado lo siguiente:

> "Éstos son: (i) que la muerte haya ocurrido mientras el actor se encontraba en un arrebato de cólera o pendencia súbita ('heat of passion'); (ii) que la muerte estuviera precedida de una provocación adecuada; y(iii) que la muerte haya ocurrido antes de que el arrebato o pendencia sufrida por el actor razonablemente se hubiera enfriado ('cooling off period')."[48]

IV

En el caso de autos, la Opinión mayoritaria sostiene que el foro intermedio apelativo erró al ordenar un nuevo juicio ya que la única instrucción que estaba justificada por la prueba fue la del delito de asesinato y sus distintos grados. Diferimos. Veamos.

El señor Negrón Ayala declaró que el día de los hechos el señor Colón González le entregó una carta de despido, a lo cual él le indicó que iban a tenerle que pagar una cantidad de dinero por concepto de mesada. A esto, el señor Colón González le contestó, "[l]o que te vamos a pegar a ti es un tiro cabrón". En ese momento observó al señor Colón González tratar de sacar un arma de fuego de una gaveta del escritorio y fue entonces cuando se le abalanzó encima, forcejearon, momento en que sostuvo se le fue la mente en blanco y lo próximo que recuerda fue ver al señor Colón González en sus pies.

---

[48] <u>Pueblo v. Rosario Orangel</u>, *supra*.

Es menester señalar que el testimonio del señor Negrón Ayala es el único que narra lo que alegadamente ocurrió dentro de la oficina del señor Colón González. El resto de los testimonios se limitan a describir lo que se escuchó antes de las detonaciones y lo que se pudo observar después de las detonaciones. Sin embargo, dos testigos de cargo declararon que oyeron una discusión entre los señores Negrón Ayala y Colón González antes de las detonaciones. El testigo, señor Ángel Figueroa Cortés escuchó una discusión que provenía de adentro de la oficina del señor Colón González y unos segundos después escuchó las detonaciones. El señor Juan Viñas narró que escuchó las voces altas de los señores Negrón Ayala y Colón González, momentos antes de escuchar la primera detonación.

Con el beneficio de la evidencia antes descrita, nos corresponde evaluar si el Tribunal de Primera Instancia tenía la obligación de impartirle al Jurado las instrucciones solicitadas por la defensa sobre el delito de homicidio. Como piedra angular de su teoría, la defensa intentó demostrar que la amenaza con un arma de fuego por parte del señor Colón González hacia el señor Negrón Ayala fue la causa de la reacción defensiva que provoca una reyerta entre ambos. Es en medio de esta reyerta que el señor Negrón Ayala alegadamente sufre tal arrebato de cólera o súbita pendencia que causa que su mente se vaya en blanco y le de muerte al señor Colón González sin la malicia premeditada requerida para que constituya asesinato.

Somos del criterio que la evidencia presentada en el caso de autos era suficiente para que el Tribunal de Primera Instancia impartiera las instrucciones al Jurado sobre el delito de homicidio. Le correspondía entonces al Jurado aquilatar la versión del acusado, y evaluar si el testimonio establecía que la muerte del señor Colón González era consecuencia de un homicidio. A nuestro entender, se presentó evidencia sobre la cual el Jurado estaba en posición de determinar si el señor Negrón Ayala se encontraba en un estado de súbita pendencia o arrebato de cólera al momento de causarle la muerte al señor Colón González. Existe evidencia de una discusión a puertas cerradas, una carta de despido, unas voces altas, de una alegada provocación al sacarse un arma de fuego, una posible legítima defensa, unos tiros, una alegada reacción violenta defensiva, y un estado de intranquilidad por parte del acusado posterior al incidente. Están presentes suficientes elementos para permitir la instrucción de homicidio solicitada por la defensa. Se debió someter la cuestión al Jurado, para que fuera éste el que rindiera el veredicto que procedía.

La Opinión mayoritaria enumera una lista de hechos que el juzgador debía "razonablemente inferir". Comienza indicándonos que el juzgador debió "razonablemente inferir" que el señor Negrón Ayala llevaba el arma de fuego en la mochila, lo cual demuestra premeditación. Es menester recalcar que la prueba directa desfilada durante el juicio <u>nunca estableció que en la mochila del señor Negrón Ayala</u>

había un arma de fuego.  Sin embargo, de la misma forma que se podía "inferir razonablemente" que el arma de fuego se encontraba en la mochila del señor Negrón Ayala, podía también "razonablemente inferirse" que en la gaveta del escritorio del señor Colón González era donde se encontraba esa arma de fuego.  Ciertamente, a la luz de la evidencia y del testimonio del señor Negrón Ayala, ambos asuntos podían ser "razonablemente inferidos" por el juzgador de los hechos.  Por ende, era al Jurado y no al Juez, al que le correspondía decidir cual de ambas versiones podía determinar como cuestión de hecho, de forma indirecta.

La Opinión mayoritaria expresa además, que se debe inferir que no hubo discusión mayor, o conflicto, ya que el "primer disparo se escuchó casi inmediatamente después que éstos entraran a la oficina…", y esto "elimina la posibilidad de una provocación o arrebato de cólera que justificara una instrucción al jurado por homicidio voluntario".  Es menester particulizar que el único testimonio que le narra al Jurado lo que alegadamente ocurrió dentro de la oficina del señor Colon González es el del acusado, señor Negrón Ayala.  El señor Negrón Ayala testificó que después que reclamó el pago de mesada, fue que el señor Colón González le dijo, "lo que te vamos a pegar a ti es un tiro, cabrón", y observó al señor Colón González tratar de sacar una pistola del escritorio fue entonces cuando se le abalanzó encima, forcejearon, y se le fue la mente en blanco.  Se podía inferir que la conversación fue de corta duración, porque el señor Colón   y

González amenazó al acusado con un arma de fuego en un espacio limitado de tiempo, lo que provocó el forcejeo entre ambos, y el desenlace que ya conocemos. A la luz de la evidencia y del único testimonio de los hechos que tenemos, ambos asuntos podían ser "razonablemente inferidos" por el juzgador de hechos. Por ende, era al Jurado y no al Juez, al que le correspondía decidir a cual de ambas versiones debía brindarle crédito.

No hay duda que el despido del señor Negrón Ayala por parte del señor Colón González fue lo que motivó la reunión entre ambos. Tanto es así, que al señor Negrón Ayala se le encontró una carta de despido en el bolsillo del pantalón. De acuerdo al testimonio del señor Negrón Ayala, se podía "razonablemente inferir" que lo que provocó la discusión inicial entre ambos fue el despido. Se podía inferir, como sostiene la Opinión mayoritaria, "…que el motivo de la agresión fue el haber sido despedido de su trabajo." Pero también se podía "inferir razonablemente" que lo que provocó la situación y el enfrentamiento entre ambos fue la amenaza del señor Colón González y su movimiento para extraer un arma de fuego de su escritorio. Era al Jurado y no al Juez, al que le correspondía formular razonablemente la inferencia que le permitiera determinar los hechos.

El juzgador de los hechos podía "razonablemente inferir", "que el acusado Negrón Ayala ciertamente tenía la intención específica de matar a Colón González pues le disparó seis veces". No se encuentra en controversia que el señor Colón González recibió seis (6) disparos. Se

puede "inferir razonablemente" que el disparar repetidas veces a una persona es evidencia de intención específica de matar. Sin embargo, en el caso de marras no hay evidencia directa de que esa fue la situación. El único testigo de los hechos es el propio acusado. Su testimonio narra que en el momento que el señor Colón González sacó la pistola del escritorio, él se le abalanzó encima, forcejearon, se le fue la mente en blanco y que lo próximo que recuerda es ver al señor Colón González en sus pies. A base de este testimonio, se puede "razonablemente inferir" que una persona amenazada con un arma de fuego sufra una reacción de tal magnitud que le cause que su mente se vaya en blanco. Y en ese alterado estado anímico, en medio de un forcejeo entre dos hombres, donde hay un arma de fuego envuelta, "in the heat of passion", se pierda la noción de cuantos disparos se hagan. Era al Jurado y no al Juez, al que le correspondía decidir a cual de ambas versiones brindarle crédito.

Sostiene la mayoría, que el juzgador de los hechos podía "razonablemente inferir", que el "…acusado actuó fríamente al cometer el delito, pues, luego de los disparos, salió y dio instrucciones sobre el cuido de su hijo y solicitó que desaparecieran el arma de fuego, lo cual demuestra que estuvo en control de sus emociones todo el tiempo". Sin embargo, a base de la prueba directa desfilada, el juzgador de hechos también podía "razonablemente inferir" que si el señor Negrón Ayala, fríamente, con sed de venganza, premeditó la muerte del

señor Colón González, no hubiera ido acompañado con su <u>hijo menor de edad</u> a cometer tal barbaridad.

De otra forma, un Jurado podía "razonablemente inferir" que el hecho que el acusado solicitara que se desapareciera el arma y se cuidara a su hijo, eran actos instintivos de auto-protección, a poco tiempo de un incidente altamente violento, confuso y traumático. De nuevo, era al Jurado y no al Juez, al que le correspondía decidir a cual de ambas versiones brindarle crédito.

Todo ello nos lleva a la conclusión que ante el panorama de posibles "inferencias razonables", era el Jurado como juzgador de hechos, y no el Juez, el que tenía que determinar si brindaba credibilidad al testimonio del señor Negrón Ayala.

Muy distinto sería el asunto, si por ejemplo, hubiera existido evidencia incontrovertible que el arma de fuego sí estaba en la mochila del señor Negrón Ayala. Dada esa situación, ya no era razonable inferir que el señor Negrón Ayala actuó como él dice que actuó. Pero esa evidencia no existe en este caso, lo único que tenemos es el testimonio del señor Negrón Ayala sobre lo que alegadamente ocurrió dentro de esa oficina. Era el Jurado quien tenía que decidir si brindaba credibilidad al testimonio del señor Negrón Ayala. Eso no le correspondía al Juez.

La Opinión mayoritaria también expresa, que el testimonio del señor Negrón Ayala <u>no</u> establece una provocación "…de tal naturaleza que lleve a una persona ordinaria a perder su dominio y actuar bajo impulsos

mentales causados por cólera, pendencia o emoción violenta".[49] Diferimos de tal criterio, el testimonio del señor Negrón Ayala, establece que: el señor Colón González le dijo "lo que te vamos a pegar a ti es un tiro, cabrón"; y que el señor Colón González trató de sacar una pistola de su escritorio. Entendemos, que el amenazar y a la vez sacar un arma de fuego es una <u>provocación</u> "de tal naturaleza que lleva a una persona ordinaria a perder su dominio y actuar bajo impulsos mentales causados por cólera, pendencia o emoción violenta".[50]  El sacar un arma de fuego a otro ser humano, ciertamente puede causar una "reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con ésta."[51]

Hemos dicho que procede revocar una convicción cuando el resultado del juicio posiblemente hubiera sido distinto de haberse comunicado cierta instrucción al Jurado.[52]  Un Juez no puede denegar una instrucción solicitada por la defensa sólo porque le parezca débil o de pobre calidad la evidencia presentada, si de esa prueba surge alguna evidencia que justifique cierta instrucción. Es deber del juez comunicar esa instrucción y permitir que sea el Jurado el árbitro final al esclarecer los hechos.  Es al Jurado a

---

[49] <u>Pueblo v. Negrón Caldero</u>, 2002 TSPR 95; <u>Pueblo v. Moreno Morales</u>, 132 D.P.R. 261, 283 (1992).

[50] Íd.

[51] <u>Pueblo v. Rosario Orangel</u>, 2003, TSPR 158.

[52] <u>Pueblo v. Acevedo Estrada</u>, 150 D.P.R. 84, 96 (2000).

quien correspondía determinar si la versión de los testigos que escucharon una discusión y la versión del acusado merecían credibilidad suficiente como para configurar el delito de homicidio.

En su escrito, el Ministerio Público argumenta y la Mayoría sostiene, que la instrucción solicitada por el delito de homicidio es una incompatible con la teoría de legítima defensa que sostiene el señor Negrón Ayala. Sin embargo, este Tribunal ha expresado lo siguiente:

> **"Cuando tanto homicidio como defensa propia están en controversia y sostenidos por la prueba, deben darse instrucciones sobre ambos.** Aunque se alegue defensa propia o se demuestre por la prueba, una instrucción de homicidio debe ser dada…"[53] (Énfasis Nuestro)

No existe obstáculo alguno para que un Juez emita instrucciones separadas de homicidio y legítima defensa siempre y cuando sean sostenidas por la prueba desfilada. Si la prueba tiende a sostener tanto una instrucción de homicidio como una de defensa propia, es obligación del Juez impartir ambas instrucciones al Jurado, y que sea el juzgador de los hechos el que decida. Por ende, respetuosamente entendemos, que concluir que una instrucción de homicidio es incompatible con una instrucción de defensa propia no es correcto, pues, dado los hechos de este caso, no son inconsistentes.

En el caso de marras, el Juez debió impartir al Jurado las instrucciones de asesinato; homicidio; y legítima defensa. Le correspondía al Jurado evaluar la evidencia

---

[53] <u>Pueblo v. Fernández</u>, *supra*.

presentada y llegar a sus propias conclusiones. Opinamos que el testimonio del acusado y la evidencia presentada en el caso de autos eran <u>suficientes</u> para que el Tribunal impartiera las instrucciones al Jurado sobre el delito de homicidio. Al no hacerlo, el Juez usurpó las funciones del Jurado y posiblemente alteró el resultado final del juicio.

Concluimos que el resultado del juicio pudo haber sido uno distinto de haberse brindado las instrucciones solicitadas por la defensa. Un análisis objetivo y sereno de la evidencia que desfilara ante el juzgador de los hechos, nos convence de que se presentó prueba suficiente para justificar impartir la instrucción del delito de homicidio. Se cometió un grave error perjudicial al acusado al así no hacerlo. Procedía que el Tribunal de Primera Instancia impartiera al Jurado las instrucciones de asesinato en primero y segundo grado; homicidio; diferencia entre el asesinato y homicidio; y legítima defensa. Le correspondía al Jurado evaluar la evidencia presentada y llegar a las conclusiones de hechos correspondientes.

## V

Por los fundamentos antes expuestos, concluimos que actuó correctamente el Tribunal de Apelaciones. Confirmaríamos la sentencia recurrida y devolveríamos el

caso al Tribunal de Primera Instancia para la celebración de un nuevo juicio.  Por no ser ese el curso de acción de la Mayoría respetuosamente DISENTIMOS.


                                        *Efraín E. Rivera Pérez*
                                          *Juez Asociado*